**In re CIRCUIT BREAKER LITIGATION.**

**No. CV 88–3012 CBM.**

United States District Court,
C.D. California.

April 1, 1997.

David Steven Olson, Carlsmith, Ball, Wichman, Case & Ichiki, Los Angeles, CA, Robert E. Currie, Latham & Watkins, Costa Mesa, CA, Alan L. Barry, James J. Jagoda, Amy J. Gast, Wallenstein & Wagner, Chicago, IL, for Plaintiff Square D Co.

Holly A. McNulty, Shield & Smith, Los Angeles, CA, Ann M. Ghazarians & Brewer, Los Angeles, CA, for Intervenor Connecticut Indemnity Co.

Brian E. Brick, Arthur Paul Berg, Berg & Brick, LaCanada, CA, for Intervenor Industrial Indemnity Co.

Paul D. Loreto, Robert P. Damone, Norby & Brodeur, Orange, CA, for Intervenor Gulf Ins. Co.

Jean M. Lawler, Murchison & Cumming, Los Angeles, CA, for Intervenor Home Ins. Co.

Maxwell M. Blecher, Donald R. Pepperman, Blecher & Collins, Los Angeles, CA, David Alan Huffaker, Alan H. Stanfill, George Oakes, Throckmorton Beckstrom Oakes & Tomassian, Pasadena, CA, Becky V. Christiansen, Becky V. Christiansen Law Office, Glendora, CA, for Defendant General Circuit Breaker & Electric Supply Inc. and Xavier Contreras.

J. Scott Bennett, Ray H. Shatzer, J. Scott Bennett Law Offices, Lake Elsinore, CA, Defendants for Panelboard Specialties Wholesale Elec., Inc. and Jamie Contreras.

Jeffrey Bradpiece Law Offices, Torrance, CA, for Defendant AC Circuit Breaker–Electrical Supply.

John S. McGeeney, Leonard C. Peterson, Paul Hastings Janofsky & Walker, Los Angeles, CA, John B. Stephens, Paul, Hastings, Janofsky & Walker, Costa Mesa, CA, Edward J. Cummings, Jr., Edward J. Cummings Jr. Law Offices, Niskayuna, NY, Robert D. Gilbert, General Elec., Fairfield, CT, Mansfield C. Neal, Jr., Mansfield C. Neal Law Office, Schenectady, NY, James P. Flynn, James P. Flynn Law Office, Plainville, CT, Norman A. Dupont, Shapiro, Hinds & Mitchell, Los Angeles, CA, for Counter–Defendant General Elec.

Jonathan D. Fink, G. Forsythe Bogeaus, Michael L. Wachtell, Buchalter, Nemer, Fields & Younger, Los Angeles, CA, John J. Verscaj, Francis J. Higgins, Margaret A. McGreal, Matthew A. Phillips, Bell, Boyd & Lloyd, Chicago, IL, for Counter–Defendant Underwriters Laboratories.

Joseph D. Lee, Gregory P. Stone, Marsha Hymanson, Ted G. Dane, Munger, Tolles & Olson, Los Angeles, CA, for Counter–Defendant Westinghouse Elec. Corp.

Ronald J. Nessim, Bird, Marella, Boxer, Wolpert & Matz, Los Angeles, CA, for Counter–Claimant MCCB, Inc. and Ricardo Contreras.

Michael J. Emling, Michael J. Emling Law Offices, Long Beach, CA, for Counter–Claimants Pecon Intern. Inc., General Magnetics/Electric and Julia Contreras.

ORDER RE: PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS' ANTITRUST AND INTENTIONAL INTERFERENCE COUNTERCLAIMS, AND UL'S MOTION TO STRIKE THE DECLARATIONS OF SMITH AND WEINSTEIN

CONSUELO BLAND MARSHALL, District Judge.

The matters before the Court, the Honorable Consuelo B. Marshall, United States

District Judge, presiding, are Plaintiffs' Motions for Partial Summary Judgment on Defendants' Antitrust and Intentional Interference for Prospective Economic Advantage Counterclaims, and UL's Motion to Strike the Declarations of Richard L. Smith and Roy Weinstein.[1] Upon consideration of the record, papers, and oral argument, the Court issues the following Order, GRANTING partial summary judgment in favor of Plaintiffs' on Defendants' antitrust and intentional interference with prospective economic advantage counterclaims, and DENYING UL's Motion to Strike.

## Background

Plaintiffs are Square D Company ("Square D"), General Electric Company ("GE"), Westinghouse Electric Corporation ("Westinghouse"), and Underwriters Laboratories, Inc. ("UL"). Defendants are Panelboard Specialties and Wholesale Electric, Inc., and Jaime Contreras ("PBS"), Pencon International d/b/a General Magnetics & Electric Wholesale, Inc., and the Estate of Charley Contreras ("Pencon/GMEW"), and General Circuit Breaker & Electric Supply, Inc., and Xavier Contreras ("GCB").

This litigation commenced in 1988, when Plaintiffs, three circuit breaker manufacturers and a certification agency, separately sued eleven circuit breaker reconditioning companies for trademark infringement and unfair competition. Since then, many of the cases have settled, and one case went to trial.[2] Defendants, the remaining circuit breaker reconditioners, have raised a number of affirmative defenses, and counterclaimed for, *inter alia*, antitrust violations under the Sherman Act and intentional interference with prospective economic advantage.

Plaintiffs brought motions for partial summary judgment against all three remaining Defendants on Defendants' antitrust and intentional interference counterclaims. The Court heard arguments on these motions on January 6, 1997.[3]

## ANTITRUST DISCUSSION

Defendants allege that Plaintiffs violated the Sherman Act, 15 U.S.C. § 1 by "engag[ing] in a continuing combination and conspiracy to unreasonably restrain trade and commerce in the sale and distribution of molded case circuit breakers and to eliminate secondary distributors of reconditioned molded case circuit breakers." (*See, e.g.,* GCB 2d Am. Countercls. ¶¶ 9–19; PBS 2d Am. Countercls. ¶¶ 9–24; Pencon/GMEW 1st Am. Countercls. ¶¶ 11–25.)

According to Defendants, Plaintiffs conspired to suppress and eliminate competition of entities engaged in the sale and distribution of reconditioned molded case circuit breakers by:

(1) filing in bad faith the lawsuits that constitute *In re Circuit Breaker Litigation;*

(2) falsely disparaging Defendants and misrepresenting facts (including issues of safety) to government agencies in an effort to induce governmental entities to commence investigations into the sale of reconditioned molded case circuit breakers;

---

1. This Order encompasses the antitrust and intentional interference portions of the following motions: (1) Square D's Motion for Partial Summary Judgment of Defendants' Antitrust and Interference Counterclaims (filed 9/16/96); (2) UL's Motion for Partial Summary Judgment on Defendants' Antitrust Claims (filed 9/16/96); (3) GE's Motion for Partial Summary Judgment on Defendants' Antitrust Counterclaims (filed 9/16/96); (4) GE's Motion for Partial Summary Judgment Against GMEW, GCB, and PBS (trade libel, defamation, and intentional interference with prospective economic advantage counterclaims) (filed 9/16/96); (5) Westinghouse's Motion for Partial Summary Judgment or, in the Alternative, for Summary Adjudication on Defendants' Antitrust Counterclaims and for Summary Adjudication of Issues on Defendants' Tortious Interference with Economic Advantage (filed 9/16/96); (6) UL's Motion for Partial Summary Judgment against PBS (*Noerr–Pennington* immunity) (filed 9/22/95); and (7) Plaintiffs' Motion to Strike the Declarations of Dr. Richard L. Smith and Roy Weinstein (filed 10/28/96).

2. *See In re Circuit Breaker Litigation,* 852 F.Supp. 883 (C.D.Cal.1994) (*Circuit Breaker I*), aff'd, 41 U.S.P.Q.2d 1741 (9th Cir.1997); *In re Circuit Breaker Litigation,* 860 F.Supp. 1453 (C.D.Cal. 1994) (*Circuit Breaker II*), aff'd, 41 U.S.P.Q.2d 1741, 106 F.3d 894 (9th Cir.1997).

3. On July 10, 1996, the Court heard arguments on UL's September 22, 1995, motion for partial summary judgment against PBS on *Noerr–Pennington* immunity. The Court took that motion under submission, and incorporates its decision as to that motion in this Order.

(3) forming, through the National Electrical Manufacturers Association ("NEMA"), a "Task Force on Rebuilt Circuit Breakers," to formulate means to eliminate competition in the reconditioned circuit breaker market;

(4) preparing, distributing, and developing false or misleading ads, statements, press releases, and media articles about Defendants;

(5) through NEMA, withdrawing a test standard applicable to molded case circuit breakers;

(6) refusing to implement a UL standard for reconditioned circuit breakers; and

(7) inducing third parties to cease doing business with Defendants.[4]

## I. Summary Judgment Law

"A party against whom a . . . counterclaim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed.R.Civ.P. 56(b). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

In moving for summary judgment, the movant assumes no obligation to negate or disprove matters on which the opponent will have the burden of proof at trial. In order to demonstrate that "there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law," the moving party need only show the Court that there is an absence of evidence to support an essential element of the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). "A failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.

Once the moving party has demonstrated the complete absence of proof on an essential element of the other party's case, the burden shifts to the opponent to come forward with sufficient evidence for a reasonable jury to find in its favor on that element. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In response, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of [the opponent's] position will be insufficient. . . ." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

## II. Summary Judgment in Sherman Act Cases

In *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), the Supreme Court held that, in order to withstand a motion for summary judgment, claimants seeking damages under § 1 of the Sherman Act "must establish that there is a genuine issue of material fact as to whether [the opposing party] entered into an illegal conspiracy that caused [the claimants] to suffer a cognizable injury." In addition, the claimants "must also show more than a conspiracy in violation of the antitrust laws; they must [also] show an injury to them resulting from the illegal conduct." *Id.* at 586, 106 S.Ct. at 1355–56.

Plaintiffs may discharge their initial summary judgment burden by "proffering a 'plausible and justifiable' alternative interpretation of its conduct that rebuts [Defendants'] allegation[s] of a conspiracy." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 632 (9th Cir.1987). If Plaintiffs meet this initial burden, Defendants must come forward with evidence that is capable of sustaining a rational inference of conspiracy and that tends to exclude the possibility that Plaintiffs acted independently. *American Ad Mgmt. v. GTE Corp.*, 92 F.3d 781 (9th Cir.1996); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

---

4. None of Defendants alleges all of these bases of liability. For instance, GCB does not allege that Plaintiffs developed and circulated false and misleading ads and press statements, and Pencon/GMEW does not include an abuse of process allegation. However, the Court addresses each of these bases as if pleaded by each Defendant against each Plaintiff.

574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986).

While the inferences to be drawn from the underlying facts must generally be viewed in the light most favorable to the party opposing a motion for summary judgment, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356. Thus, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 588, 106 S.Ct. at 1356 (citing *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984)). In other words, claimants "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [them]." *Id.*

## III. Substantive Antitrust Law

■ To prove a violation of § 1 of the Sherman Act, Defendants must show the existence of a "contract, combination or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. A violation of the Sherman Act consists of three elements: "(1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the person or entities intend to harm or restrain competition; and (3) which actually restrains competition." *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 854 (9th Cir.), *cert. denied*, 516 U.S. 861, 116 S.Ct. 170, 133 L.Ed.2d 111 (1995); *City of Vernon v. Southern Cal. Edison Co.*, 955 F.2d 1361, 1365 (9th Cir.), *cert. denied*, 506 U.S. 908, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992); *Eichman v. Fotomat Corp.*, 880 F.2d 149, 161 (9th Cir. 1989) (stating that restraint of trade evaluated under either *per se* or rule of reason test). Even if a claimant can establish illegal conduct, a claimant must further show that it suffered injury as the result of that illegal conduct. *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1443–44 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 424 (1996).

## IV. *Noerr–Pennington Immunity From Antitrust Liability*

■ The *Noerr–Pennington* doctrine provides broad protection from the Sherman Act for concerted efforts to influence the deci-

sions of public officials. *United Mine Workers v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965). This protection extends to lobbying both the executive and legislative branch. *Eastern R.R. Presidents Conference v. Noerr Motor Freight Inc.*, 365 U.S. 127, 137–38, 81 S.Ct. 523, 528–30, 5 L.Ed.2d 464 (1961), and to petitioning of administrative agencies and courts, *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 622–12, 30 L.Ed.2d 642 (1972).

■ A party's immunity for its efforts to influence public officials is lost only if the party engages in "sham" petitioning. *USS–POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council*, 31 F.3d 800, 810 (9th Cir.1994). "Sham" petitioning is that which *both:* (1) is objectively baseless in the sense that no reasonable petitioner could realistically expect success on the merits; and (2) conceals an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anti-competitive weapon. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61, 113 S.Ct. 1920, 1928–29, 123 L.Ed.2d 611 (1993). When reviewing a claim of "sham" petitioning, a court must apply the two parts in succession. Only if a suit or petitioning activity is found to be objectively baseless, does the court proceed to examine the litigant's subjective intent. *Id. USS–POSCO Indus.*, 31 F.3d at 811.

Defendants base part of their Sherman Act counterclaims upon (1) the filing of these lawsuits and (2) Plaintiffs' contacts with various government agencies that investigated Defendants in the late 1980s. (See GCB 2d Am. Countercls. ¶ 15(c)-(d); PBS 2d Am. Countercls. ¶ 19(c)-(d); Pencon/GMEW 1st Am. Countercls. ¶ 21(3).) Both sets of activities are protected by *Noerr–Pennington* immunity.

### A. Plaintiffs' Lawsuits

■ Defendants allege that Plaintiffs instituted in bad faith the lawsuits constituting *In re Circuit Breaker Litigation* for the "sole and exclusive purpose of restricting and elim-

inating [Defendants'] ability to compete with the manufacturing [Plaintiffs] and causing prospective purchasers to boycott [Defendants'] products." (GCB 2d Am. Countercls. ¶ 15(d); PBS 2d Am. Countercls. ¶ 19(d).)

Plaintiffs demonstrate that the filing of the lawsuits constituting *In re Circuit Breaker Litigation* is immune from antitrust liability under the *Noerr–Pennington* doctrine. Plaintiffs demonstrate that the lawsuits do not constitute "sham" litigation in that they are not "objectively baseless in the sense that no reasonable petitioner could realistically expect success on the merits." *See Professional Real Estate Investors, Inc.*, 508 U.S. at 60–61, 113 S.Ct. at 1928–29. Plaintiffs present evidence that:

1. Defendants admit to photocopying Plaintiffs' trademarks and admit to selling reconditioned products without labels on the products disclosing the condition of the products, which the Court finds supports a prima facie claim of trademark infringement and unfair competition under *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 129–30, 67 S.Ct. 1136, 1138–39, 91 L.Ed. 1386 (1947), and the Lanham Act;

2. Plaintiffs have obtained stipulated permanent injunctions against most of the original defendants in *In re Circuit Breaker Litigation*;

3. Plaintiffs obtained preliminary injunctions against all three Defendants;

4. The Justice Department issued criminal indictments against three of the original defendants for the same conduct at issue in *In re Circuit Breaker Litigation*, leading to 2 guilty pleas; and

5. The jury in the Westinghouse trial found that Pencon/GMEW, GCB, and PBS's relabelling practices violated the Lanham Act. *See In re Circuit Breaker Litigation (Circuit Breaker I)*, 852 F.Supp. 883, 891–92 (C.D.Cal.1994), *aff'd*, 106 F.3d 894, 41 U.S.P.Q.2d 1741 (9th Cir.1997).

While the Court notes Defendants' success on their affirmative defenses in the Westinghouse trial against Westinghouse's claims of trademark infringement and unfair competition, the Court also finds that Plaintiffs' success thus far in this litigation indicates that the lawsuits are not "objectively baseless," which precludes a finding that *In re Circuit Breaker Litigation* constitutes "sham" petitioning. The district court in the Westinghouse trial noted that

[f]or the most part, defendants and Westinghouse agree that the jury necessarily made certain findings of fact. They agree that, in finding liability on both the § 1114 and § 1125 claims, the jury necessarily found: 1) that defendants sold reconditioned breakers bearing the Westinghouse mark; 2) that they did not designate them as 'reconditioned'; 3) that they did so without Westinghouse's consent; and 4) that this practice was likely to cause confusion.

*In re Circuit Breaker Litig.*, 852 F.Supp. 883, 887 (C.D.Cal.1994), *aff'd*, 106 F.3d 894, 41 U.S.P.Q.2d 1741 (9th Cir.(1997)).

This evidence is sufficient for the Court to find as a matter of law that Plaintiffs' lawsuits are immune from antitrust liability under *Noerr–Pennington*. Because the Court may find as a matter of law that Plaintiffs' lawsuits are not objectively baseless, it need not reach the issue of Plaintiffs' subjective intent.

**B. Plaintiffs' Contacts with Government Investigators and Agencies**

■ Defendants also allege that Plaintiffs violated § I of the Sherman Act by inducing the government to "commence investigations into the purchase, use and installation of reconditioned circuit breakers by falsely disparaging such breakers and the companies distributing such breakers and by falsely suggesting catastrophic safety problems resulting from their use in order to create undue fear and alarm and to induce prospective purchasers to boycott [Defendants'] products." (*See* GCB 2d Am. Countercls. ¶ 15(c); PBS 2d Am. Countercls. ¶ 19(c); Pencon/GMEW 1st Am. Countercls. ¶ 21(3).)

*Noerr–Pennington* shields all communications with the government. A party's immunity for its efforts to influence public officials is lost only if it engages in "sham" petitioning. *USS–POSCO Indus.*, 31 F.3d at 810. In order to deprive Plaintiffs of immunity for their contacts with government entities, Plaintiffs' contacts must be objectively baseless in the sense that no reasonable petitioner could realistically expect success on the merits. *Professional Real Estate Investors*,

*Inc.*, 508 U.S. at 60–61, 113 S.Ct. at 1928–29. Furthermore, under *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500, 108 S.Ct. 1931, 1936–38, 100 L.Ed.2d 497 (1988), and *Boone v. Redevelopment Agency of the City of San Jose*, 841 F.2d 886, 894 (9th Cir.1988), *Noerr–Pennington* even precludes antitrust liability based on the use of false statements to persuade the government to act.

It is undisputed that Plaintiffs, acting individually and through the National Electrical Manufacturers Association ("NEMA"), had contact with the Nuclear Regulatory Commission ("NRC") and other governmental organizations regarding rebuilt molded case circuit breakers. Defendants present evidence only in regard to Plaintiffs' effort to petition the Nuclear Regulatory Commission. The Court finds that Plaintiffs' contacts with the NRC and other governmental entities in 1988, to include the U.S. Department of Justice, the U.S. Department of Energy, NASA, and the U.S. Department of Defense, are immune from antitrust liability under *Noerr–Pennington*.

Plaintiffs present evidence that their contacts with the government in and around the institution of this lawsuit were reasonable in light of Plaintiffs' concerns about product safety, trademark infringement, and unfair competition. For instance, the evidence indicates that on March 4, 1988, NEMA considered "undertak[ing] to have laws enacted to require that rebuilt equipment be labeled as rebuilt and/or certified by an independent testing laboratory." (GCB Ex. 5.) NEMA cited that its concern was "based on safety and/or market mis-representation issues." (GCB Ex. 5.) The evidence also indicates that in April 1988, Pacific Gas & Electric Company discovered that it had bought rebuilt Square D circuit breakers for installation at the Diablo Canyon nuclear power plant. The evidence indicates that Square D tested these circuit breakers and reported to the NRC that they were rebuilt. (GCB Ex. 22.) The NRC responded by launching an investigation into purchases of reconditioned circuit breakers by nuclear power plant licensees. In the course of its investigation, the NRC solicited from Plaintiffs advice and guidance

as to issues regarding molded case circuit breakers. (GCB Ex. 9.)

The evidence indicates that the NRC issued a bulletin on June 18, 1988, regarding the potential problems presented by rebuilt molded case circuit breakers. (GCB Ex. 19.) NEMA commented on NRC Bulletin 88–10, and was critical of the NRC's proposed test program for rebuilt circuit breakers. (GCB Ex. 25.) On November 22, 1988, the NRC issued a formal version of its Bulletin, which disregarded in part the recommendations of UL and NEMA, requiring utilities to test circuit breakers that could not be traced to the original manufacturer. (GCB Ex. 26.) NEMA members believed that this standard did not appreciate the safety issues presented by rebuilt circuit breakers, and recommended further lobbying. (GCB Ex. 23.)

The Court finds that none of this evidence sustains Defendants' burden of demonstrating that Plaintiffs' contacts with the government constitutes "sham petitioning." The evidence indicates that Plaintiffs reasonably could have expected the government to have adopted strict inspection and testing standards for rebuilt molded case circuit breakers. There is no evidence that implies that the government was manipulated, no evidence that Plaintiffs lied to the government, and no evidence that Plaintiffs used false information in their petitioning activities.

Thus, the Court finds that Plaintiffs' contacts with the government in and around the institution of this lawsuit are protected by *Noerr–Pennington*.

## V. Liability for Non–Protected Activity

■ To prevail, Defendants must present evidence that their purported competitive injuries resulted from Plaintiffs' non-protected activities. *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir.1983) ("If a plaintiff has suffered financial loss from the lawful activities of a competitor, then no damages may be recovered under the antitrust laws. It is a requirement that an antitrust plaintiff must prove that his damages were caused by the *unlawful* acts of the defendant.") (emphasis in original).[5] Defendants allege antitrust vio-

---

5. The Court notes that the declarations of GCB and Pencon/GMEW's experts, Richard Smith and

Roy Weinstein, do not account for injury that

lations that fall outside of the scope of Plaintiffs' protected petitioning activities. The Court addresses each allegation in turn.

### A. Group Boycott

██ Defendants allege that Plaintiffs engaged in a "group boycott." Group boycotts are treated as *per se* violations of the Sherman Act only when the challenged activity "would almost always tend to be predominantly anticompetitive." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1411 (9th Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991);[6] *NCAA v. Board of Regents of Univ. of Okla.*, 463 U.S. 85, 100, 103 S.Ct. 2890, 2901–02, 77 L.Ed.2d 490 (1984) ("A *per se* rule is applied when the [agreed upon] practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.") (internal quotations omitted).[7]

The Court finds that none of Plaintiffs' non-immune actions are the type that "always tend to be predominantly anticompetitive." Thus, the Court finds that Plaintiffs' non-immune activities do not constitute a group boycott.

### B. Coercing Customers to Stop Doing Business with Defendants

Defendants also allege that Plaintiffs conspired to coerce Defendants' customers to stop doing business with Defendants in violation of § 1 of the Sherman Act. (*See* GCB 2d Am. Countercls. ¶ 15(e); PBS 2d Am. Countercls. ¶ 19(e); Pencon/GMEW 1st Am. Countercls. ¶ 21(4).)

██ Because the Court finds that Plaintiffs' activities do not constitute a *per se* violation of the Sherman Act, the Court uses the "rule of reason" test in assessing the anti-competitive nature of Plaintiffs' non-immune activities. To prevail on a § 1 violation under the Sherman Act using the "rule of reason" test, a claimant must prove: "(1) an

agreement, conspiracy or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (i.e., 'antitrust injury')." *Austin v. McNamara*, 979 F.2d 728, 738–39 (9th Cir. 1992) (citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir.1988)). In addition, a claimant must show more than simply parallel behavior. *Reserve Supply v. Owens–Corning Fiberglas*, 971 F.2d 37 (7th Cir.1992) (conscious parallel behavior by itself is not enough to support an antitrust conspiracy claim).

██ The gravamen of Defendants' allegations is that Plaintiffs acted in concert. Collective action is the linchpin of antitrust liability. It is settled law that independent business decisions not to deal with a party do not violate the Sherman Act. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984).

██ Defendants present no evidence of any concerted action on the part of Plaintiffs, through NEMA or otherwise, to induce or persuade customers or distributors to stop doing business with Defendants. They rely instead on inferences drawn from simultaneous attempts by the individual Plaintiffs to deal with either their distributors or their internal subdivisions. Plaintiffs may discharge their initial summary judgment burden by "proffering a 'plausible and justifiable' alternative interpretation of its conduct that rebuts [Defendants'] allegation[s] of a conspiracy." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 632 (9th Cir.1987). If Plaintiffs meet this initial burden, Defendants must come forward with evidence that is capable of sustaining a rational inference of conspiracy and that tends

---

may have been caused exclusively by *non-Noerr–Pennington* protected activity. The Court also notes that PBS provides no evidence on the issue of antitrust injury to its business as a result of Plaintiffs' activities.

**6.** Activities that can constitute *per se* violations include price-fixing, group boycotts, tying arrangements, and horizontal territorial divisions.

**7.** When this matter was originally filed in 1988, the law firm Munger, Tolles & Olson represented all four Plaintiffs, and filed nearly identical complaints on behalf of each Plaintiff. The Court finds that representation by one law firm is not grounds for antitrust liability. *Lemelson v. Bendix Corp.*, 104 F.R.D. 13, 17–18 (D.Del.1984).

to exclude the possibility that Plaintiffs acted independently. *American Ad Mgmt. v. GTE Corp.*, 92 F.3d 781 (9th Cir.1996); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). However, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57. Thus, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 588, 106 S.Ct. at 1356 (citing *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984)).

In order to prevail, Defendants must first present evidence that tends to exclude the possibility of independent action. Because of the *Noerr–Pennington* protection afforded to Plaintiffs' petitioning activities, Defendants' evidence is limited to Plaintiffs' non-immune activities.

Defendants present evidence that Square D contacted its distributors in October 1988 and informed them of the lawsuit, Defendants' alleged activities, the preliminary and permanent injunctions obtained at the time, and Square D's intent to continue to investigate. (GCB Ex. 46.) Defendants present evidence that GE instituted a recall program on its circuit breakers in an effort to get GE circuit breakers that it had not rebuilt returned to it. (GCB Ex. 61.) The Court finds that this evidence does not sustain Defendants' burden and does not raise a genuine issue of material fact. Defendants provide no evidence that the other Plaintiffs knew about this recall program, nor evidence that they acted in concert with GE. Furthermore, this evidence is as consistent with legitimate business practice as it is with anti-competitive behavior, in that it exhibits a concern for liability and manufacturer warranty. Under such circumstances, it is reasonable for GE to have instituted a recall program to protect itself.

In order to prevail, Defendants must also present evidence that their customers and distributors were induced by Plaintiffs to stop doing business with Defendants. The Court finds that Defendants have not sustained their burden on this issue. Defendants present no direct testimony from customers or distributors. In fact, Defendants present no evidence whatsoever implicating UL in the alleged effort to dissuade Defendants' customers and distributors. Defendants rely on the testimony of Rene Contreras to support the proposition that Plaintiffs induced Defendants' customers to stop doing business with Defendants. (R. Contreras Decl.; GCB Ex. 28.) However, Rene Contreras' declaration is conclusory and lacks supporting evidence. In addition, evidence presented by Plaintiffs indicates that customers and distributors either did not stop doing business with Defendants (Heronemus Dep. at 94), made an independent decision to stop doing business with Defendants (Mitchell Dep. at 26–35; Tulloch Dep. at 84–85, 103–04, 113, 116), or were Plaintiffs' subsidiaries (i.e., GESCO (GE's subdivision) and WESTCO (Westinghouse's subdivision)).[8]

Thus, the Court finds that Defendants have not sustained their burden of demonstrating that Plaintiffs induced Defendants' customers to stop doing business with Defendants. The evidence indicates that Plaintiffs made reasonable, self-interested business decisions, or made decisions wholly within their own corporations not to buy rebuilt circuit breakers that could not be traced to the original manufacturers.

## C. Refusing to Implement a UL Standard for Reconditioned Circuit Breakers

Defendants allege that UL's decision not to create a certification program for rebuilt molded case circuit breakers was made in concert with the other Plaintiffs and that it constitutes an illegal restraint of trade in violation of § 1 of the Sherman Act. (*See, e.g.,* Pencon/GMEW 1st Am. Countercls. ¶ 21(7).)

■ A standards-setting organization does not *per se* violate the antitrust laws by refusing to certify a product. *Consolidated*

8. Internally coordinated conduct between a corporation and an unincorporated division does not violate § 1 of the Sherman Act. *Copperweld*

*Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 2740–41, 81 L.Ed.2d 628 (1984).

*Metal Prod. v. American Petroleum Inst.,* 846 F.2d 284, 292 (5th Cir.1988). Rather, the "rule of reason" test applies to such conduct. Under this test, the question is whether an antitrust defendant's conduct "promotes competition or ... suppresses competition." *National Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1359, 55 L.Ed.2d 637 (1978).

██ "To state a claim against a standard-making organization such as UL '[a claimant] must show either that it was barred from obtaining approval of its products on a discriminatory basis from its competitors, or that the conduct as a whole was manifestly anti-competitive and unreasonable.'" *ECOS Elec. Corp. v. Underwriters Labs, Inc.,* 743 F.2d 498, 501 (7th Cir.1984) (citing *Eliason Corp. v. National Sanitation Found.,* 614 F.2d 126, 129 (6th Cir.), *cert. denied,* 449 U.S. 826, 101 S.Ct. 89, 66 L.Ed.2d 29 (1980)), *cert. denied,* 469 U.S. 1210, 105 S.Ct. 1178, 84 L.Ed.2d 327 (1985).

### 1. UL's Decision Not to Create a Certification Program for Rebuilt Circuit Breakers was Neither Discriminatory or Unreasonable

██ Defendants allege that UL violated § 1 of the Sherman Act by not granting UL Listing to Defendants and by not creating a UL certification program for rebuilt circuit breakers. Defendants allege that UL made its decision in concert with and at the behest of the manufacturing Plaintiffs. It is undisputed that UL considered, but did not adopt a certification program for rebuilt molded case circuit breakers. It is undisputed that two Defendants applied for and were denied UL Listing.

UL is an organization that creates product standards and certifications. Products that meet UL's criteria are given a Listing. The Listing for molded case circuit breakers is UL 489. Since 1940, UL 489 has imposed a regimen of safety tests applicable to circuit breakers. According to UL, its safety certification system is premised on the testing of representative product samples. *Midwest Plastic Fabricators, Inc. v. Underwriters Labs. Inc.,* 906 F.2d 1568, 1569–70 (C.A.Fed. 1990). It is undisputed that many of the tests required by UL 489 are destructive. (Vogeler Decl. ¶¶ 15–18.)

UL presents evidence that its decision not to adopt a standard for rebuilt circuit breakers was reasonable, non-discriminatory, and based entirely on technical feasibility. UL presents evidence that it could not formulate a program for rebuilt breakers because rebuilt circuit breakers are not uniformly reconstructed and, accordingly, are not able to be subjected to destructive or sample testing. UL presents evidence that there is no uniformity in the rebuilding process, and that Defendants recondition circuit breakers based upon "each individual circuit breaker's needs and the requests of the customer." (*See* GCB's Answers to GE's 2d Set of Interrogs.) UL also presents evidence that it could not trace the history of the parts used in the reconditioning process, because Defendants obtain their materials from "other than factory sources." (Contreras Letter, July 21, 1988, UL App. 190.) According to UL, this creates a problem, because UL considers destructive testing and traceability to be "two important parts of the [circuit breaker] program." (Vogeler Dep. at 127.)

In rebuttal, Defendants present no evidence that UL 489 discriminated against them in refusing to establish a certification program for rebuilt molded case circuit breakers. They present no evidence that UL 489 constitutes an unreasonable restraint of trade because it cannot be used to certify rebuilt circuit breakers. Defendants also present no alternative test program that could satisfy UL's destructive testing requirement, nor present any evidence as to how their rebuilding procedures could fit within the sampling requirements of UL 489.

Thus, the Court finds that Defendants do not sustain their burden.

### 2. UL Adequately Considered a Rebuild Program

██ Defendants also allege that UL's decision not to adopt a standard or certification program for rebuilt circuit breakers was (1) done in concert with the manufacturing Plaintiffs, (2) abrogated UL's own process for establishing certification programs, and (3) was an illegal restraint of trade in violation of the Sherman Act.

UL presents evidence that it acted alone and within its standard operating procedures in deciding against establishing a certification program for rebuilt molded case circuit breakers. UL admits that a reconditioning company requested a rebuild standard for circuit breakers. UL also admits that UL agreed to consider such a program. UL admits that in 1984 and 1988, the issue of a UL program for rebuilt molded case circuit breakers was discussed at meetings of the Industrial Advisory Council ("IAC"). (*See* PBS Ex. 17.)

However, UL presents evidence that it had its engineers evaluate the feasibility of such a program, and that UL decided that such a program was not feasible. (UL App. at 205–10.) UL also presents evidence that it uses IACs to help with its development of requirements, test methods, standards, and related product evaluation programs. (UL App. at 236).[9] UL presents evidence, however, that it bases the technical requirements of its programs on information gathered from a number of sources. (UL App. at 236.) UL points out that there is no evidence that UL's engineering department ever approved a certification program for rebuilt molded case circuit breakers.

In addition, UL admits that it asked the manufacturing Plaintiffs if they were interested in a rebuilt circuit breaker program from UL. However, UL presents evidence that this is routine, because the manufacturers are the industry likely to be affected by such a certification. Furthermore, UL points out that Defendants present no evidence that the manufacturing Plaintiffs caused UL to not adopt a rebuilt program, nor that UL acted in concert with the manufacturing Plaintiffs when it made its decision not to adopt a rebuilt program.

Thus, the Court finds that Defendants do not sustain their burden of raising a genuine issue of material fact as to whether UL abrogated its own procedures in deciding against a rebuilt program against Defendants or that UL's decision was made in concert with the manufacturing Plaintiffs.

### 3. UL's Refusal to Implement Program Did Not Injure Defendants

 Defendants allege that UL's decision not to adopt a standard or certification program for rebuilt molded case circuit breakers is anti-competitive. The Court disagrees. UL presents evidence that its standards apply to all circuit breakers, regardless of the manufacturer, and that its refusal to create a certification program for reconditioned circuit breakers applies to circuit breakers rebuilt by either Defendants or Plaintiffs. UL also presents evidence that it is not the sole certification agency operating in the market, and that it did not coerce or induce any customers into refusing to buy non-UL Listed products. Defendants could seek certification for their rebuilt circuit breakers from another organization.

Thus, the Court finds that Defendants do not sustain their burden of demonstrating injury to their businesses as a result of UL's decisions.

### 4. UL's Refusal to Implement Program Did Not Injure Market

In *In re Appraiser Found. Antitrust Litig.* 867 F.Supp. 1407, 1418 (D.Minn.1994) (citing *Greater Rockford Energy & Tech. v. Shell Oil,* 998 F.2d 391, 404 (7th Cir.1993)), *aff'd, National Ass'n of Review Appraisers & Mortgage Underwriters, Inc. v. Appraisal Found.,* 64 F.3d 1130 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996), the court held that a claimant's failure to present evidence proving a causal connection between the alleged anti-competitive conduct and the antitrust claimant's injuries was sufficient to justify summary judgment. In this case, Defendants present no evidence that any injury resulted from UL's refusal to implement a certification program. In fact, neither of Defendants' experts addresses the impact of UL's decision on the market.

Thus, the Court finds that UL's decision not to adopt a standard for rebuilt circuit breakers does not violate the Sherman Act. Defendants did not sustain their burden of

---

9. IACs consist of technical experts who have a familiarity with UL and its programs. (UL App. at 236.) If UL were considering a program such

as a rebuilt circuit breaker certification or standard, it is not unusual for UL to raise the issue with an appropriate IAC.

presenting evidence that UL acted in concert with the other Plaintiffs, that UL discriminated against Defendants, that UL's decision was anti-competitive, or that UL's decision caused Defendants any injury.

### D. Plaintiffs' Alleged Media Campaign

■ Defendants argue that Plaintiffs violated § 1 of the Sherman Act by "preparing, distributing, and developing false or misleading ads, statements, press releases and media articles." (*See, e.g.,* PBS 2d Am. Countercls. ¶ 19(f).) Their argument is identical to the argument that Defendants presented on their trade libel and defamation counterclaims. (*See* PBS 2d Am. Countercls. Counts 3 & 4.)[10]

The evidence shows that one Plaintiff (Square D) considered a publicity campaign (PBS Exs. 5–7), that articles were published in the press that quoted Plaintiffs and referred to some of the Defendants, and that Plaintiffs had the opportunity to review an article for "technical accuracy" prior to its publication. (PBS Ex. 11.) Based upon this evidence, the Court finds that Defendants do not sustain their burden of demonstrating that Plaintiffs acted in concert to prepare, distribute, or develop any media material in an anti-competitive manner.

Therefore, the Court finds that Defendants may not hold Plaintiffs liable for antitrust violations based upon allegations of trade libel or defamation to the extent that the Court has already ruled on them.

### E. NEMA

Defendants allege that Plaintiffs violated § 1 of the Sherman Act by "forming, through NEMA, a 'Task Force on Rebuilt Breakers,' an organization to suppress and eliminate the competition of reconditioned molded case circuit breakers," and "through NEMA, withdraw[ing] testing standards applicable to molded case circuit breakers." (Pencon/GMEW 1st Am. Countercls. ¶ 21(2), (6).)

The National Electrical Manufacturers Association ("NEMA") is a trade association of which Westinghouse, GE, Square D, and other electrical manufacturers are members. UL is not a member of NEMA.

As stated above, under the "rule of reason" test, to establish a § 1 violation under the Sherman Act, a claimant must show: "(1) an agreement, conspiracy or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (i.e., 'antitrust injury')." *Austin v. McNamara,* 979 F.2d 728, 738–39 (9th Cir. 1992) (citing *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 811 (9th Cir.1988)). A claimant must prove that each antitrust defendant had a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984).

### 1. NEMA's Contacts with the Nuclear Regulatory Commission

In their opposition papers, Defendants allege that Plaintiffs, through NEMA, violated § 1 of the Sherman Act by undertaking to have laws enacted requiring labeling and certification for reconditioned circuit breakers. Plaintiffs do not dispute that NEMA petitioned government agencies, to include the NRC, on the issue of rebuilt circuit breakers. However, the Court finds that NEMA's contacts with the government are immune under *Noerr–Pennington.*[11]

### 2. Forming NEMA's Task Force on Rebuilt Circuit Breakers

■ Defendants also allege that the mere formation of the Task Force violates the Sherman Act. Defendants allege that the formation of the Task Force was motivated by

**10.** The evidentiary cornerstone of Defendants' claim is the article by Arthur Freund, entitled *Circuit Breakers—Boon or Bomb?* which appeared in EC & M magazine in June, 1989. The Court already found that this article was not actionable against any of the Plaintiffs on either trade libel or defamation grounds. (*See* Order, dated February 24, 1997 (granting summary judgment in favor of Plaintiffs on Defendants' trade libel and defamation counterclaims)). The Court also found that Defendants did not sustain their burden on the issue of conspiracy. (*See* Order, dated February 24, 1997.)

**11.** *See supra* at 1273–76 (discussing *Noerr–Pennington* immunity).

anticompetitive intentions to destroy competition in the rebuilt molded case circuit breaker market.

"Attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws." *Moore v. Boating Indus. Ass'n,* 819 F.2d 693, 712 (7th Cir.), *cert. denied,* 484 U.S. 854, 108 S.Ct. 160, 98 L.Ed.2d 115 (1987); *Greater Rockford Energy & Tech. v. Shell Oil,* 998 F.2d 391, 396–97 (7th Cir.1993) (finding that common membership in trade association and standard-setting organization was not evidence of conspiracy); *Consolidated Metal Prods., Inc. v. American Petroleum Inst.,* 846 F.2d 284 (5th Cir.1988).

The Court finds that, even taking the evidence in a light most favorable to Defendants, Defendants have not raised a genuine issue of material fact as to whether the formation of the Task Force violates the Sherman Act.

The Court also finds that Defendants do not sustain their burden of demonstrating antitrust injury caused by the formation of NEMA's Task Force. Defendants present no evidence tying NEMA's Task Force to any changes in the market, and no evidence tying NEMA's Task Force to any of Defendants' individual business losses. The Court finds that the opinions and conclusions made by their expert witnesses, Smith and Weinstein, and the declarations submitted by their employees, such as Rene Contreras, do not support a causal connection between the NEMA Task Force, on the one hand, and any injuries to Defendants or the market generally, on the other. *See In re Appraiser Found. Antitrust Litig.,* 867 F.Supp. at 1418.

### 3. NEMA's Rescission of AB–2

Finally, Defendants allege that Plaintiffs violated § 1 of the Sherman Act by acting through NEMA to rescind AB–2.

NEMA promulgated AB–2 in 1984. In January 1989, after the commencement of this litigation, NEMA voted to rescind AB–2. Plaintiffs argue that NEMA's rescission of AB–2 cannot give rise to antitrust liability because NEMA's decision was motivated by legitimate safety concerns and not an intent to injure competition. Defendants have not presented evidence that the rescission of AB–2 injured competition in the reconditioned circuit breaker market.

According to Plaintiffs, AB–2 was a field test intended to be used to verify the performance of circuit breakers that had been in service for some time. Plaintiffs present evidence that AB–2 was a non-binding "authorized engineering information," which "consists of explanatory data and other engineering information of an informative character not falling within the classification of a NEMA Standard or Suggested Standard for Future Design." (NEMA Standardization Policies and Procedures, GE Ex. 32.) Plaintiffs note that NEMA's standards and procedures do not carry the force of law, and NEMA has no means by which to coerce compliance with AB–2 or any other NEMA promulgation. Plaintiffs also present evidence that NEMA was concerned that reconditioning companies were using AB–2 as a certification test, and that the NRC had directed nuclear facilities to use the test to check their circuit breakers. (Heerlein Dep.; Baird Dep.)

The Court finds that the evidence submitted by Plaintiffs indicates that AB–2 was rescinded for legitimate technical reasons. The letters and deposition testimony focus on the issues of safety and manufacturer liability. Defendants present no evidence tending to show that AB–2 was rescinded for any reason other than NEMA's concern over safety.

In addition, Plaintiffs point out that Defendants present no evidence that they were injured by the rescission of AB–2, or that the market for reconditioned circuit breakers was in any way affected by the rescission of AB–2. There is no evidence that indicates that any Defendants advertised their products as AB–2 tested.

Based on the foregoing, the Court finds that the Plaintiffs' non-immune actions through NEMA do not constitute a violation of the Sherman Act.

### III. Proving Antitrust Injury

The Ninth Circuit has stated that proving antitrust injury is important in a § 1 case. *Austin v. McNamara,* 979 F.2d 728,

739 (9th Cir.1992). "Antitrust injury" is "injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged." *Id.* at 738. To establish antitrust injury, a claimant must show "not merely injury to himself as a competitor, but rather injury to competition." *Id.* at 739.

Defendants rely primarily on the declarations of two expert witnesses in an effort to sustain their burden as to antitrust injury. While the Court finds that these witnesses are qualified to provide expert testimony in an antitrust matter,[12] the Court does not believe that their testimony or findings are helpful to determining whether Plaintiffs' non-immune activities were anticompetitive or violative of the Sherman Act. First, the Court finds that their testimony is relevant only to Defendant GCB. Second, the Court finds that Defendants' experts' testimony is conclusory, and opines as to the ultimate fact at issue. This evidence does not assist the Court in assessing antitrust injury. Third, the Court finds that the experts fail entirely to delineate between the injuries caused by Plaintiffs' immune activities and those activities not protected under the *Noerr–Pennington* doctrine.

Thus, the Court finds that Defendants have not sustained their burden of providing evidence of any "antitrust injury" that can be attributed to any of Plaintiffs' non-protected activities.

### Antitrust Conclusion

Based upon foregoing, the Court finds that Defendants have not sustained their burden of showing that there exists a genuine issue of material fact as to any of their Sherman Act counterclaims. Thus, the Court grants Plaintiffs' motions for partial summary judgment against Defendants as to all of their antitrust counterclaims.

### INTENTIONAL INTERFERENCE DISCUSSION

In nearly identical language, Defendants counterclaim against Westinghouse, GE, and Square D for intentional interference with prospective economic advantage. (*See* PBS 2d Am. Countercls. ¶¶ 25–31; Pencon/GMEW 1st Am. Countercls. ¶¶ 45–51; GCB 2d Am. Countercls. ¶¶ 28–34.)[13] Defendants allege that the manufacturing Plaintiffs "induced and encouraged [distributors, contractors, industrial companies, and governmental entities] to cease doing business with or to significantly reduce the amount of business they do with [Defendants]." (GCB 2d Am. Countercls. ¶ 31.) Defendant allege that plaintiffs accomplished this "through threats of loss of distributorship, intimidation and false statements and other intentional conduct by employees, agents, managers, officers, and directors of [Plaintiffs]." (Pencon/GMEW 1st Am. Countercls. ¶ 49.)

 To prevail on a claim of intentional interference with prospective economic advantage, a claimant must provide evidence of: (1) an economic relationship between itself and third parties containing the probability of future economic benefit; (2) the defendant's knowledge of these relationships; (3) intentional, wrongful conduct on the part of the defendant designed to interfere with or disrupt the relationships; (4) actual disruption; and (5) resulting damage. *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 380 n. 1, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995). The allegedly tortious conduct must be "wrongful by some legal measure other than the fact of interference itself." *Id.* at 393, 45 Cal.Rptr.2d 436, 902 P.2d 740.

 Defendants have the burden of demonstrating that Plaintiffs' conduct is wrongful in an actionable sense. They do not sustain their burden. Defendants present no evidence that Plaintiffs engaged in non-*Noerr–Pennington-protected* wrongful conduct that caused Defendants injury. To the extent that Defendants' claims for intentional interference are based on conduct protected by the *Noerr–Pennington* doctrine, such claims fail because the conduct cannot be found wrongful under a state tort law. *Sessions*

---

**12.** The Court finds that the expert testimony of Smith and Weinstein is not objectionable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Federal Rule of Evidence 702.

**13.** Pencon/GMEW counterclaims only against Westinghouse and GE. Pencon/GMEW settled its case with Square D.

*Tank Liners, Inc. v. Joor Mfg., Inc.,* 17 F.3d 295, 301–02 (9th Cir.1994) (where a party is shielded from liability under *Noerr–Pennington* for certain conduct, it cannot be liable for intentional interference with prospective economic advantage for that same behavior). Thus, Defendants must establish injuries stemming from a disruption of a relationship, not the filing of *In re Circuit Breaker Litigation* or Plaintiffs' other petitioning activities.

To the extent that Defendants' claims for intentional interference with prospective economic advantage are based on allegedly defamatory statements, such claims also fail. *Blatty v. New York Times Co.,* 42 Cal.3d 1033, 1045–48, 232 Cal.Rptr. 542, 728 P.2d 1177 (1986) (where basis of an intentional interference allegation is the injurious falsehood of a statement, no claim exists if the statements are true or if they do not specifically refer to the party seeking recovery). The Court granted partial summary judgment in favor of Plaintiffs on Defendants' trade libel and defamation counterclaims, and as such, these allegations cannot constitute the requisite independent "wrongful conduct" under *Della Penna.*

In addition, Defendants fail to sustain their burden as to the extent of their injuries suffered by Plaintiffs' non-protected and legal activities. Defendants present no evidence tying their injuries to conduct "wrongful by some legal measure other than the fact of interference itself." *See Della Penna,* 11 Cal.4th at 393, 45 Cal.Rptr.2d 436, 902 P.2d 740. While Defendants' experts testify that Plaintiffs' activities injured Defendants, they do not establish by evidence the requisite causal connection between Plaintiffs' non-immune activities and Defendants' injuries. Like the evidence presented in support of their antitrust claims, Defendants are not able to tie injuries to actions. They and their experts instead rely on generalizations. In order to withstand this motion for summary judgment, Defendants needed to present evidence tying non-protected activities to business losses. They have not done this.

### Intentional Interference Conclusion

Based upon the foregoing, the Court finds that Defendants have not sustained their burden as to presenting evidence indicating (1) wrongful conduct or (2) injury. Thus, the Court grants partial summary judgment in favor of the Plaintiffs as to Defendants' counterclaims for intentional interference with prospective economic advantage.

### CONCLUSION

Based upon the foregoing, the Court GRANTS Plaintiffs' motions for partial summary judgment against Defendants' antitrust and intentional interference counterclaims. The Court DENIES UL's motion to strike the declarations of Richard Smith and Roy Weinstein.

IT IS SO ORDERED.