NATIONAL ASSOCIATION OF REVIEW APPRAISERS AND MORTGAGE UNDERWRITERS, INC., Plaintiff/Appellant,

v.

The APPRAISAL FOUNDATION; The Appraisal Institute; American Institute of Real Estate Appraisers; Society of Real Estate Appraisers; American Society of Appraisers; National Society of Real Estate Appraisers, Defendants/Appellees.

The APPRAISAL FOUNDATION, Plaintiff/Appellee,

v.

NATIONAL ASSOCIATION OF REAL ESTATE APPRAISERS, INC., Defendant/Appellant.

The APPRAISAL FOUNDATION, Plaintiff,

v.

NATIONAL ASSOCIATION OF REAL ESTATE APPRAISERS, INC., Defendant.

NATIONAL ASSOCIATION OF REAL ESTATE APPRAISERS, INC., Counter–Plaintiff/Appellant,

v.

The APPRAISAL FOUNDATION; The Appraisal Institute; American Institute of Real Estate Appraisers; Society of Real Estate Appraisers; American Society of Appraisers; National Society of Real Estate Appraisers, Counter–Defendants/Appellees.

NATIONAL ASSOCIATION OF REVIEW APPRAISERS AND MORTGAGE UNDERWRITERS, INC.; National Association of Real Estate Appraisers, Inc., Plaintiffs/Appellants,

v.

Roy MORRIS, Defendant/Appellee.

NATIONAL ASSOCIATION OF REVIEW APPRAISERS AND MORTGAGE UNDERWRITERS, INC.; National Association of Real Estate Appraisers, Inc., Plaintiff/Appellants,

v.

Roy G. GREEN; George Hamilton Jones, Defendants/Appellees.

NATIONAL ASSOCIATION OF REVIEW APPRAISERS AND MORTGAGE UNDERWRITERS, INC.; National Association of Real Estate Appraisers, Inc., Plaintiffs/Appellants,

v.

Joseph S. DURANT, Defendant/Appellee.

Nos. 94–2689, 94–3074.

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1995.

Decided Aug. 29, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 10, 1995.*

* Murphy, Circuit Judge, took no part in the consideration or decision of this case.

Joseph Alioto, San Francisco, CA, argued (Daniel R. Shulman, Minneapolis, MN, on the brief), for appellant.

Peter Hendrixson, Minneapolis, MN, argued (Kathleen D. Sheehy and Sue Halverson, Minneapolis, MN; Paul R. Hannah and Laurie A. Zenner, St. Paul, MN; Jerome C. Schaefer and John P. Wintrol, Washington, DC; David Marx, Jr. and Anne Pramaggiore, Chicago, IL, on the brief), for appellee.

Before WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and BOGUE,** Senior District Judge.

WOLLMAN, Circuit Judge.

The National Association of Review Appraisers and Mortgage Underwriters and the National Association of Real Estate Appraisers (hereinafter referred to as the "Review Association" and "Appraisers' Association" individually, and collectively as the "Associations") appeal from the district court's [1] orders granting summary judgment for the Appraisal Foundation and certain of its member organizations and trustees (collectively the "Foundation") on the Associations' various antitrust and tortious interference claims. We affirm.

## I.

In the mid 1980s, as pressure began to increase for regulation of the appraisal industry in the wake of the nation-wide savings and loan debacle, a number of appraisal organizations decided to get together to set standards for the industry in an attempt at self-regulation. As a result of this union of interests, the Foundation was created in 1987 to establish uniform appraisal standards and criteria for certifying appraisers. The eight founding member organizations appointed between one and three trustees to the Foundation depending on their size. Other members, which were organizations composed of users of appraisal services, were allowed to appoint one trustee to the board, and two at-large trustees were elected by the appointed trustees. In 1989, Congress passed Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), which charged the Foundation's Appraiser Standards Board and Appraiser Qualifications Board with promulgating industry standards for federally regulated transactions. *See* 12 U.S.C. §§ 3339, 3345.

In 1991, the Foundation amended its by-laws to create three different types of sponsorship to the Foundation effective January 1, 1992—appraisal, affiliate, and corporate.

Appraisal sponsors are appraisal organizations; whereas affiliate and corporate sponsors are, respectively, non-profit and for-profit organizations with a "demonstrable interest" in appraisals and appraisal practices. The board of trustees is now composed of one trustee for each appraisal and affiliate sponsor that meets sponsorship criteria, and fourteen at-large trustees selected from a pool of candidates sponsored by each category of affiliation. Since the by-laws were amended, the Foundation has admitted two appraisal and three affiliate members, as well as several corporate sponsors. About 66% of all appraisers (62,651 total) belonged to organizations affiliated with the Foundation in 1990. As of 1992, membership encompassed approximately 71% of all appraisers (70,221 total).

The Review Association filed an antitrust action under the Sherman Act, 15 U.S.C. §§ 1 & 2, in 1991, challenging the Foundation's continuing refusal to admit the Review Association as an appraisal sponsor dating back to its initial application for membership in 1988. The Review Association claims that it meets all membership criteria and that the Foundation's control over the industry has effectively crippled the Review Association's ability to compete with other appraisal organizations that are Foundation members. The Foundation subsequently brought a declaratory judgment action against the Appraisers' Association seeking to establish that the Foundation had not violated the antitrust laws for likewise declining to grant that organization membership status. The Appraisers' Association counterclaimed, asserting claims similar to those of the Review Association. These are apparently the only two appraiser organizations that have applied but not been admitted to sponsorship in one form or another. Both are managed by the same corporate entity, International Association Managers, Inc., and are essentially controlled by the same individual and executive director, Robert G. Johnson. Ken Twitchell is the managing director of the Appraisers' As-

---

** The HONORABLE ANDREW W. BOGUE, Senior United States District Judge for the District of South Dakota, sitting by designation.

1. The Honorable Diana E. Murphy, then Chief Judge, United States District Court for the District of Minnesota, now United States Circuit Judge for the United States Court of Appeals for the Eighth Circuit.

sociation and director of national affairs for the Review Association. The cases were consolidated with several cases brought by the Review Association against the Foundation's trustees.

## II. Antitrust Claims

### A.

The Associations assert that the Foundation's actions constitute a *per se* antitrust violation as a group boycott. The direct result of this failure to admit, according to the Associations, has been a marked decline in membership, with the Review Association's membership declining from more than 7,500 in 1990 to fewer than 3,000 members by 1993, and the Appraisers' Association seeing its membership drop from a peak of more than 20,000 in 1989 to fewer than 10,000 in 1993. These numbers take on even more meaning for the Associations when considered in light of the fact that their respective memberships had increased over the three year period prior to 1990. As further evidence of the anticompetitive nature of exclusion, the Associations contrast the declining membership of other organizations during periods those organizations were not members of the Foundation with the increased membership of those within the Foundation.

When challenged actions or practices yield a "pernicious effect on competition and lack ... any redeeming virtue" they are *per se* invalid. *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). In such situations the actions so lack redeeming social and competitive value as to warrant being struck down "without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Id.; see Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 2616–17, 86 L.Ed.2d 202 (1985). The Foundation's membership criteria are inherently exclusionary and thereby necessarily restrict competition to some degree. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 500, 108 S.Ct. 1931, 1937, 100 L.Ed.2d 497 (1988) (noting that an agreement regarding product standards is an implicit agreement not to deal in non-conforming products); *Northwest Stationers,* 472 U.S. at 289, 105 S.Ct. at 2616 (acknowledging that "every commercial agreement restrains trade"). When the exclusion of an organization on the purported basis of those criteria appears to serve some legitimate purpose necessary to the proper functioning of the Foundation and overall efficiency of the market, however, we will analyze that exclusion under the rule of reason to determine whether it in fact does impermissibly restrict competition. *See Federal Trade Comm'n v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458, 106 S.Ct. 2009, 2017–18, 90 L.Ed.2d 445 (1986) (noting reluctance "to condemn rules adopted by professional associations as unreasonable *per se* "); *Northwest Stationers,* 472 U.S. at 297–98, 105 S.Ct. at 2621–22 (expulsion from wholesale cooperative does not warrant *per se* treatment). Organizations are free to associate, share information, and engage in self-regulation. Accordingly, in the absence of any showing that the challenged practices are anticompetitive on their face, we will apply the rule of reason to determine if there is an antitrust violation. Additionally, courts should hesitate to apply a *per se* rule when there is a question as to the extent of a practice's economic impact. *See Indiana Dentists,* 476 U.S. at 458–59, 106 S.Ct. at 2017–18; *see also United States v. Brown Univ.,* 5 F.3d 658, 672 (3d Cir.1993) (accepting that economic harm is less certain when the market restraint is motivated by its social utility).

The Foundation's exclusion of the Associations does not appear so deleterious on its face as to be considered *per se* illegitimate. The Foundation was created to promote educational and ethical standards for appraisal services, and its membership criteria appear to be designed to accomplish those goals by establishing such standards and requiring non-profit status for appraisal organizations. Such requirements generally pose merely incidental market restraints and are necessary to successful industry self-regulation. Establishing and enforcing such criteria may even serve some pro-competitive purposes by increasing the relative market efficiencies. *See Allied Tube,* 486 U.S. at 501, 108 S.Ct. at 1937–38 (noting that where

**1134**

"private associations promulgate ... standards based on the merits of objective expert judgments and through procedures that prevent the standard setting process from being biased by members with economic interests in stifling product competition ... those private standards can have significant procompetitive advantages"); *Pope v. Mississippi Real Estate Comm'n*, 872 F.2d 127, 130 (5th Cir.1989) ("If properly administered, membership requirements serve pro-competitive purposes.").

Further, finding a *per se* violation is not mandated by the antitrust laws because this is not a case in which the alleged boycott "cut[s] off access to a supply, facility, or market necessary to enable the boycotted [associations] to compete." *Northwest Stationers*, 472 U.S. at 294, 105 S.Ct. at 2619–20. To accept the Associations' argument to the contrary would require us to hold that every appraiser organization has an intrinsic and immutable right to membership in the Foundation. This is clearly not what Congress intended when it vested the Foundation with the authority to establish standards. Indeed, such a holding would defeat the very purpose of having the Foundation establish standards and admission criteria. The Associations have failed to convince us that the failure to admit cuts off their ability to transact business with their members or potential members.[2] Access to the market cannot be equated with success in the market. Nor does the exclusion eliminate access of their members to the related market of those in need of appraisal services.

**B.**

■ There can be no doubt that the Associations have suffered a declining membership base in recent years. That, however, is not the full extent of our inquiry. *See National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 690, 98 S.Ct. 1355, 1364–65, 55 L.Ed.2d 637 (1978) (confining the inquiry "to a consideration of impact on competitive conditions"). We need not decide whether the Foundation has engaged in conspiratorial behavior, or whether the Foundation is capable of such conduct, for even assuming such to be the case, the Associations have failed to generate the inference of causal harm necessary to their claim.

■ The parties agree that the market in which appraiser organizations vie for members is the relevant market. Thus, the issue is properly framed as whether the Foundation's refusal to admit the Associations has made the market for appraisal organizations less competitive. A group boycott results in impermissible harm even if it results in lower prices or temporarily stimulates competition because such boycotts have, by their "nature and character, a monopolistic tendency" to restrain free trade. *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959) (internal quotes omitted). In the absence of such a *per se* violation of the antitrust laws, however, incidental harm to an

---

**2.** We recognize the subtle distinctions that may alter an analysis from *per se* to the rule of reason and the potential blurring of those distinctions when faced with a combination such as we have here. *See SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2600, 132 L.Ed.2d 846 (1995); *see also* 7 P. Areeda & H. Hovenkamp, *Antitrust law* ¶¶ 1511, 1511' (1986 & Supp.1994) (discussing the collapsing inquiry). We need not anatomize the precedents to crystallize their theoretical development, however. Suffice it to say that our analysis of the relevant economic structures and market forces at issue here makes it evident that this is not a situation requiring *per se* treatment. *See generally National Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85, 104 n. 26, 104 S.Ct. 2948, 2962 n. 26, 82 L.Ed.2d 70 (1984) (noting that "[p]er se rules may require considerable inquiry

into market conditions before the evidence justifies a presumption of anticompetitive conduct"). Nor do the Associations' claims that the market power vested in the Foundation by the combination of its members represents a facility essential to competition. Given the apparent facial validity of the exclusion of the Associations by the Foundation, whatever restraint that exclusion poses must be analyzed under the rule of reason to determine the extent of its power and effect on competition. This will in turn answer the question whether indeed the Foundation is an essential facility and if any denial of access is truly anticompetitive in nature. *See* Areeda & Hovenkamp, *supra*, ¶¶ 736.2a, 736.2f (Supp.1994) (asserting that denial of access to an essential facility is never deemed per se unlawful). This is entirely consonant with the usual application of the rule of reason standards to such cooperative conduct.

individual competing in the market is a necessary residuum of the competitive process. In such an environment one competitor will always suffer some form of "harm" relative to a competitor that gains an advantage. *See Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 21 (1st Cir.1990), *cert. denied*, 499 U.S. 931, 111 S.Ct. 1337, 113 L.Ed.2d 268 (1991). Society reaps the benefits of such competitive behavior through lower prices, better products and services, and greater market efficiencies as individual competitors seek to gain an advantage. Only anticompetitive behavior, *i.e.* behavior that tends to lessen the potentiality for society to realize the benefits of the competitive process, is proscribed. *See id.* at 21–22; *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

The Associations attempt to foist blame on the Foundation for a decrease in the number of appraisers operating in the United States today and the attendant rise in cost of appraiser services. The Associations offered some evidence that consumers of appraiser services prefer appraisers that are members of organizations affiliated with the Foundation. There is no evidence tending to connect the Associations' individual harm to any such harm on the overall market for appraisal organizations, however. The Associations' claims of harm to the market reflect mere individual harm. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 635 (9th Cir.1987) (party cannot withstand summary judgment motion in absence of evidence of harm to competition). Blaming the Foundation for fluctuations in the market for individual appraiser services, and the resulting impact on association memberships, fails to raise a sufficient inference that there was harm to the competition among appraiser organizations. *See Legal Economic Evaluations, Inc. v. Metropolitan Life Ins.*, 39 F.3d 951, 954–56 (9th Cir.1994) (finding asserted harm to competition to actually lie in a different market), *cert. denied*, — U.S. ——, 115 S.Ct. 1420, 131 L.Ed.2d 304 (1995). Rather, such claims are contradicted by evidence of an increase in the number of educational programs offered by the Associations as they compete with other organizations for the affiliation of appraisers. Nor is there any evidence that membership prices in organizations have increased or that the number and quality of such organizations or their output in terms of educational offerings or other benefits to their members has decreased since the dawn of the Foundation. *See Visa USA*, 36 F.3d at 968 (lack of evidence of increased price, decreased output, or other anticompetitive indicia in the relevant market shows that challenged collective rule making body lacks market power).

Even if we were to accept further that the decline in the Associations' membership ranks could sufficiently establish harm to the overall market in which appraisal organizations compete, such a claim must fail in this instance for a lack of a sufficient causal nexus to the Foundation's activities. To succeed on their claims, the Associations must show that a reasonable jury could find that the Foundation's exclusionary behavior was a material cause of the harm suffered. *See Alexander v. National Farmers Org.*, 687 F.2d 1173, 1210 (8th Cir.1982), *cert. denied*, 461 U.S. 937, 938, 939, 103 S.Ct. 2108, 2110, 77 L.Ed.2d 313, 314 (1983). The Associations "may not recover for losses due to factors other than the [Foundation's] anticompetitive violations." *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1494 (8th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993).

A number of highly publicized missteps and other considerations have contributed greatly to the Associations' current deflated membership base, so much so that the Associations cannot claim that their exclusion from the Foundation was a substantially contributing factor to their problems. *See Greater Rockford Energy & Tech. Corp. v. Shell Oil*, 998 F.2d 391, 404 (7th Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). First, they have received a great deal of negative attention for maintaining lax standards. That cat was let out of the bag, so to speak, when the Appraisers' Association designated a feline named Tobias as a member without verifying his credentials. The Appraisers' Association sued Tobias' owner for defamation when he publicly called the association a diploma mill in the wake of this incident. In that suit, the Appraisers' Association claimed that it had

witnessed a dramatic drop in membership renewal rates as a result of the negative publicity. The district court found the characterization accurate and denied relief. *National Ass'n of Real Estate Appraisers, Inc. v. Schaeffer*, C.A. No. 89–0225T (D.R.I. June 1, 1989); *see also National Ass'n of Real Estate Appraisers, Inc. v. Schaeffer*, No. CV 88–7774–RJK (TX), 1989 WL 267762 (C.D.Cal. Mar. 23, 1989) (dismissal for lack of personal jurisdiction).

That case was referred to in the course of the adoption of subsequent amendments to FIRREA. The House Operations Committee specifically noted that it did "not intend in any way to suggest that membership [in the Foundation] should be available to such groups as the National Association of Real Estate Appraisers and its related organizations," precisely because of the finding that they were diploma mills. H.R.Rep. No. 101–981, 101st Cong., 2d sess. 1, 7 n. 1 (1990). There can be little doubt but that the lingering stigma of this incident has contributed greatly to the Associations' difficulty in attracting and retaining members.

The Appraisers' Association has also blamed the State of Washington for a decrease in membership. In 1990, the Association filed suit alleging that a designation of state-licensed appraisers as "State–Certified Real Estate Appraisers" infringed on the Association's trademark rights regarding the "Certified Real Estate Appraisers" designation. In an affidavit submitted in that case, Johnson stated that the state legislation had caused the Association to lose members. The present litigation has also been a drain on membership strength.

In addition to their own litigious efforts to assign blame for their decreased market share, Johnson and Twitchell have both faced recent legal action on other fronts. Both pleaded guilty to charges stemming from a Federal Elections Commission investigation into illegal contributions to the 1988 presidential campaign. Further, the Department of Labor filed suit against International Association Managers for failing to account for and pay overtime to certain former employees. These incidents have done little to en-

hance the reputation or membership ranks of either association.

Further, representatives of the American Association of Certified Appraisers and the National Association of Master Appraisers, two other appraisal organizations that also witnessed declining membership before they became Foundation members (which membership decline the Associations point to as evidence of the harm on the overall market), attribute the decline in membership to factors entirely independent from the activities of the Foundation. The advent of state certification has rendered less essential affiliation with an organization and has apparently affected the entire industry. As noted above, the overall market for appraisers has declined, and the Foundation is not to be faulted for the natural market forces driving the market for real estate appraisers. Moreover, the impact of the restraint, whatever it may be, cannot be adequately determined because the Associations apparently could participate in the Foundation in another capacity, an avenue they have not explored.

The Associations have blamed everyone but themselves for their current difficulties, but their problems can be traced directly back to the corporate office. We do not require a negation of all possible explanations for the decreased membership, but in the face of this record the allegations of conspiratorial harm are too speculative to raise a triable issue. Accordingly, because the Associations have failed to establish the existence of a triable fact on the issue of causation, an element essential to their case, the entry of summary judgment in favor of the Foundation was entirely appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 576, 106 S.Ct. 1348, 1350–51, 89 L.Ed.2d 538 (1986) (must show conspiracy and injury to survive motion for summary judgment).

### III. Tortious Interference

Citing their decreased membership base and attendant reduction in revenues, the Associations next contend that the Foundation's actions constitute a tortious interfer-

ence with contractual relations under Minnesota law. To fashion such a claim, the Associations must show that the Foundation intentionally and wrongfully interfered with existing or prospective contractual relations and that but for the Foundation's actions they would have received the benefits of those relations. *See United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632–33 (Minn. 1982); *Amerinet*, 972 F.2d at 1506, 1508. Our discussion of the causation aspect of the antitrust claims sufficiently disposes of this issue. *Amerinet*, 972 F.2d at 1508–09. In light of the host of problems faced by the Associations, they are unable to make out a submissible case that had they been admitted to the Foundation they would have retained members and attracted new members.

The judgment is affirmed.