**GLEN HOLLY ENTERTAINMENT, INC., d/b/a Digital Images, Plaintiff,**

v.

**TEKTRONIX, INC., an Oregon Corporation, and Avid Technology, Inc., a Delaware Corporation, Defendants.**

**No. CV 99–02476 SVW (RCx).**

United States District Court, C.D. California.

Sept. 15, 1999.

Jeffrey T. Makoff of Makoff Kinnear Counsel P.C., San Francisco, CA, for Plaintiff.

Stanley M. Gorinson, John L. Longstreth and Jeffrey Marks of Preston Gates Ellis & Rouvelas Meeds, LLP, Washington, DC, for Defendants.

## ORDER DISMISSING ANTITRUST CLAIMS IN PLAINTIFF'S FIRST AMENDED COMPLAINT WITH LEAVE TO AMEND

WILSON, District Judge.

## I. INTRODUCTION

As is so often the case in antitrust law, a deceptively simple set of facts forces the Court to confront a doctrinal quagmire. This case requires the Court to determine whether a rental firm, owning and renting only one type of video editing system, suffers antitrust injury if the only two manu-

facturers of video editing systems conspire to discontinue this particular type of video editing system and thereby render the rental firm's current inventory obsolete and undesirable.

Notwithstanding the fact that Plaintiff's injury derives from the anti-competitive nature of the Defendants' alleged conduct, the Court concludes that Plaintiff's injury is not the sort of harm that the antitrust laws were intended to prevent. In addition, Plaintiff's harm is suffered in a different market than the market in which Defendants allegedly conspired. As a result, the Court concludes that Plaintiff has not demonstrated "antitrust injury" and therefore fails to state a claim. The Court will therefore DISMISS the current antitrust claims with leave to amend.

## II. FACTS ALLEGED IN THE COMPLAINT RELEVANT TO PLAINTIFF'S ANTITRUST CLAIMS

In evaluating a motion to dismiss, the Court must take all facts alleged in the Complaint as true and must draw all reasonable inferences in favor of the non-moving party. However, the Court need not accept conclusory allegations. Under that standard the relevant allegations for the purposes of the current motion [1] can be summarized as follows:

The current case revolves around non-linear digital editing systems. Non-linear digital editing systems are computerized video editing systems, which allow video editors the ability to easily access and rearrange images and audio tracks without physically cutting and splicing film and audio track.[2]

Prior to September 3, 1998. Defendants Tektronix and Avid were the only two manufacturers of non-linear digital editing systems supplying the U.S. film market. Although the Tektronix "Lightworks" line had once commanded a dominant position in part of the video editing market, the total Lightworks market share had dropped to a mere 15% by September 3, 1998. Avid held the other 85% share of the video editing market.

Plaintiff Glen Holly Entertainment, Inc. ("Digital Images") is (or was) a business that specializes in video editing. Although Plaintiff Digital Images did some editing itself on behalf of movie and TV producers, it is clear that the vast majority of Plaintiff's business consisted of renting video editing equipment to producers so that the producers could do such editing themselves. At all relevant times to this Complaint, Plaintiff Digital Images based all of its operations around the Tektronix Lightworks line to the exclusion of Avid products.[3]

On September 3, 1998, Tektronix and Avid announced a "joint venture." As part of this joint venture, Tektronix agreed to discontinue its Lightworks line and thereby cease competition with Avid. In return for allowing Avid complete dominance of market for the manufacture and sale of non-linear digital editing systems, Tektronix was given a preferred position as an Avid distributor.

The "joint venture" had a devastating effect on Plaintiff's business. Aware that

---

1. Plaintiff has also alleged various state law fraud claims against Tektronix arising out of Tektronix statements about its future plans made before September 3, 1998. These statements are not relevant to the antitrust claims and are discussed in a separate Order.

2. Although not explicitly alleged in the Complaint, it can be inferred from the various features discussed therein that digital editing systems are also advantageous because they allow easier manipulation of the images and sounds themselves, such as the addition of various special effects.

3. Digital Images describes itself in its complaint as an exclusive Lightworks "vendor." Although the entertainment industry may use this term to describe rental companies like Digital Images which rent only Lightworks equipment, the term "vendor" has apparently lead to some unnecessary confusion. The Court will refer to Digital Images in this capacity as a "lessor" of Lightworks equipment.

the Lightworks line had been discontinued, video producers refused to have their work edited on Lightworks products.[4] As Plaintiff's business consisted exclusively of using and renting Lightworks products, Plaintiff's business was abruptly destroyed.

## III. LEGAL ANALYSIS

### A. Requirement of Antitrust Standing and Antitrust Injury

Defendants have both moved to dismiss the antitrust claims on the argument that Plaintiff has failed to adequately allege antitrust injury and antitrust standing. The Ninth Circuit's recent opinion in *American Ad Management, Inc. v. General Telephone Co. of California*, 190 F.3d 1051 (9th Cir. 1999) (*"American Ad II"*) contains an excellent discussion of the nature and relationship of antitrust injury and antitrust standing.

Although the antitrust laws might on their face appear to provide a cause of action to anyone "whose injuries are causally related to an antitrust violation," *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir.1996), the Supreme Court has concluded that Congress did not intend the antitrust laws to have so expansive a scope. *American Ad II*, 190 F.3d 1051 (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 530–35, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). To provide meaningful application of the antitrust laws, courts therefore developed the notion of antitrust standing. To assure that a plaintiff is the proper plaintiff to bring suit, a court must "'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.'" *American Ad II* (quoting *Associated General*, 459 U.S. at 535, 103

S.Ct. 897). The existence of antitrust standing and antitrust injury are issues of law. *American Ad II*.

To assist in this evaluation of antitrust standing, courts have considered five factors derived from the Supreme Court's decision in *Associated General*. *American Ad II* (citing *Amarel*, 102 F.3d at 1507 and *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir.1998)). One of these five factors is of particular importance: antitrust injury. *American Ad II, Amarel*, 102 F.3d at 1507. Antitrust injury is regularly described as "'necessary, but not always sufficient, to establish [antitrust] standing.'" *American Ad II*, quoting *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *see also Barton & Pittinos, Inc. v. Smithkline Beecham Corp.*, 118 F.3d 178, 182 (3rd. Cir. 1997) (citing *Cargill*).

In other words, although antitrust injury is sometimes discussed within the context of antitrust standing, it is easier to say that antitrust injury is a necessary precondition for antitrust standing. A court will therefore evaluate antitrust injury first and then, if antitrust injury exists, the court will turn to the remaining factors for antitrust standing.

### 1. Antitrust Injury

To state an antitrust claim, a plaintiff "must prove the existence of 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) ("ARCO") (quoting

---

**4.** The Complaint does not specify why potential customers refused to use a discontinued product, but the Complaint implies that such customers recognized that they would have to use Avid products in the future and should therefore begin their training on Avid products. The Court also assumes that customers refused to use Lightworks because work done with a discontinued computer product is often difficult to use in the future; once a product line has been discontinued, it is often difficult to find equipment capable of working with files formatted for that discontinued product line.

*Brunswick Corp., v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). An injury "will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny, since it is inimical to [the antitrust laws] to award damages for losses stemming from continued competition." *ARCO*, 495 U.S. at 334, 110 S.Ct. 1884 (internal quotations and citations omitted).

### a. Four Requirements Derived from ARCO

■ In its recent discussion, the Ninth Circuit found in the above language "four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *American Ad II.*

### b. Plaintiff Must Usually Be A Participant In the Market Restrained by Defendants' Conduct

■ In addition to these four requirements, however, the Ninth Circuit has also identified a fifth requirement: antitrust injury requires that the plaintiff have suffered its injury in the same market where competition is being restrained. *American Ad II.* "Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Id.* Although a plaintiff need not be a customer or competitor in the restrained market, a plaintiff does need to be a participant in the restrained market. *Id.*

However, there is an exception to this requirement. A plaintiff need not be a participant in the restrained market if the plaintiff's injuries are "inextricably intertwined" with the injuries of market participants. *Id.* at n. 5, citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) and *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 745–46 (9th Cir.1984).

### 2. Antitrust Standing

If a plaintiff has demonstrated antitrust injury, the Court must then evaluate whether an antitrust plaintiff has antitrust standing. In other words, even if the plaintiff's injuries result from the unlawful nature of the defendants' alleged conduct, the Court must assure itself that the plaintiff is the proper party to bring suit.

■ In addition to antitrust injury, there are four other factors derived from *Associated General* that courts regularly consider:

(2) the directness of the injury;

(3) the speculative measure of the harm;

(4) the risk of duplicative recovery; and

(5) the complexity in apportioning damages.

*American Ad II*, citing *Amarel*, 102 F.3d at 1507 (in turn citing *Associated General*, 459 U.S. at 535, 103 S.Ct. 897).

### B. Market Definition

#### 1. Level of Specificity at Which the Affected Market Must Be Defined

Defendants object that Plaintiff fails to adequately identify the affected market with sufficient particularity to allow the Court to evaluate the harm to competition. Plaintiff argues that it has alleged a per se violation and that the harm to competition is therefore presumed.

As discussed below, the Plaintiff has alleged the affected markets with sufficient particularity that the Court may evaluate antitrust injury. Because the Court finds that Plaintiff has failed to allege antitrust injury, the Court need not (and does not) consider whether Plaintiff's allegations would state a per se violation of the antitrust laws or a violation evaluated under the rule of reason.

#### 2. There Are Two Separate Markets Disclosed in Plaintiff's Complaint: The Purchase Market and the Renting Market

In the original round of briefing for this motion, the parties disagreed on how to

characterize the Plaintiff's position in the video editing market. Digital Images argued that it was a purchaser of video equipment and therefore had antitrust standing to complain of the injury to its business. Defendants argued that Digital Images was a distributor because it was merely an intermediary between the manufacturer and the end user. Defendants argued that Digital Images therefore does not have antitrust standing because distributors usually do not have standing.

As the Court indicated in its May 25, 1999 Order, both characterizations failed to recognize that there are, in fact, two separate markets revealed in Plaintiff's Complaint. The first is the purchase market for new non-linear digital editing systems. The second is the rental market for non-linear digital editing systems. Plaintiff is a customer in the purchase market, and a lessor in the rental market.[5]

### 3. The Two Markets Relate to Non-Linear Digital Editing Equipment Generally and Not the Lightworks Line in Particular

The Court adds that the markets described in the complaint are markets for digital non-linear editing equipment generally, not markets for Lightworks equipment in particular. This is a significant distinction, because Plaintiff's allegations must be measured by the impact on the purchase market for non-linear digital editing equipment and the rental market for non-linear digital editing equipment. It may be true that Defendants have entirely destroyed the sub-markets relating to Lightworks equipment but the destruction of such a submarket will not give rise to antitrust claim.[6]

---

5. In response to this characterization, Avid cited *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), for the proposition that "markets generally are defined at the consumer level according to product substitutability." This is a correct statement of the law.

   However, the relevant products are viewed not only in terms of the physical item used but also in the way in which consumers purchase the product in question. Using the automotive example discussed infra, it is obvious that the car renting market is separate from the car buying market; there is very little cross-elasticity between the two markets because people do not generally choose between renting and buying cars. By contrast, it is less clear that the leasing market for automobiles is separate from the purchase market, because people may choose between leasing and buying a car.

   Although it is possible that there is some cross-elasticity between renting and purchasing video editing equipment, the Court would assume that there is a reasonably clear point at which an entity does enough video editing to make it worth purchasing the equipment. The Court would further assume that the vast majority of video editors are well to one side or another of that point.

   More importantly, despite an explicit invitation at Note 8 of the Court's May 25, 1999 Order, no party has chosen to disagree with the Court's characterization of two separate markets. Plaintiff, in fact, indicated that it "believes that the Court's analysis of this case in terms of two markets (purchase and rental markets) is correct."

   The Court does not now rule out the possibility that, on amendment, Plaintiff may allege that there is only a single market for "use of video editing equipment." However, the Court would caution Plaintiff both that such an allegation must be made in good faith and that such an allegation runs the risk of placing Plaintiff in the position of being a distributor.

6. The Court draws this market definition from the allegations of the First Amended Complaint, which plainly allege a "U.S. Market for Non-Linear Film Editing Systems." *See generally* First Amended Complaint ¶¶ 7–10.

   It is not inconceivable that Plaintiff could have alleged a market limited to Lightworks products alone. However, the Court notes that such a limited market would seem to fly in the face of the Ninth Circuit's decision in *General Business Systems v. North American Philips Corp.*, 699 F.2d 965 (9th Cir.1983). In that case, the Ninth Circuit rejected the argument that a market should be limited to one line of computers because purchasers were "locked into" that line of computers. *Id.* at 972. Instead, the Ninth Circuit held that the relevant market was all similar small business computer systems.

   This is not to say that markets can never be limited to a particular product line, if there is no reasonable cross-elasticity between the

## C. Plaintiff Has Failed to State a Claim for Injury in the Purchase Market

■ The Court begins by noting that, as a purchaser, Plaintiff might have standing to bring an antitrust claim for increased prices in the purchase market for new non-linear digital editing systems. Although Defendants have intimated that Plaintiff is merely be an intermediary, the Court concludes that Plaintiff as lessor would be the ultimate consumer in the purchase market and any harm to Plaintiff's customers is derivative of such harm to Plaintiff. *Illinois Brick Co. v. State of Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *cf. Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 929 (9th Cir.1994) (applying antitrust analysis to determine that subtenant had no RICO standing to challenge increase in master tenant's lease, despite pass through provision for increase).[7] In addition, to the extent that Plaintiff itself engages in actual editing at a client's request, Plaintiff would also have standing because Plaintiff would be purchasing on its own behalf.

In addition, the Court assumes *without deciding* that Plaintiff might have standing to bring suit for lack of future innovation of purchased machines in the non-linear digital editing market.[8] Assuming *without deciding* that a lack of future innovation is a cognizable antitrust injury in a private antitrust action, Plaintiff would clearly have standing to the extent that Plaintiff itself engages in actual editing. The Court does not reach the question of whether Plaintiff as lessor or the end renter would be the appropriate party to bring suit.[9]

However, to have standing in the purchase market, Plaintiff must allege that it is actually a purchaser in that market. In other words, Plaintiff must allege that it will pay higher prices or purchase less-capable machines as a result of the anti-competitive behavior of the Defendants. Plaintiff's complaint does not allege that Digital Images has made or intends to

---

particular market and markets for other brands. For example, replacement parts for Ford cars may be an entirely different market than replacement parts for Chrysler cars. *See generally Eastman Kodak Co. v. Image Technical Services Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (replacement parts Kodak copiers may be cognizable market). However, this complaint focuses upon production of new systems, and courts have usually rejected the claim that one brand is its own market when there are competing brands. *Little Caesar Enterprises, Inc. v. Smith*, 34 F.Supp.2d 459, 477 n. 30 (E.D.Mi. 1998); *cf. State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 282, 139 L.Ed.2d 199 (1997) ("[T]he primary purpose of the antitrust laws is to protect interbrand competition.").

7. The Court's May 25, 1999 Order contained an example that illustrated this point. Imagine that Ford and General Motors agreed not to sell their cars to any rental car agency, so that such rental car agencies would have to purchase cars at inflated prices from Daimler-Chrysler. Although such rental car agencies are not the actual drivers of the cars, they are clearly the victims of the conspiracy as the parties who pay the higher prices. Moreover, although the artificial increase may be passed through in whole or in part to the ultimate car renters, it is obviously the rental agency and not the renter who has suffered the antitrust injury and who has antitrust standing.

The parallel is clear. If Digital Images pays an artificially increased price for new video editing equipment. Digital Images has suffered antitrust harm and has antitrust standing.

8. The Court notes that the parties have provided some briefing on the question of whether private plaintiffs may sue for an artificial constraint on innovation. Nevertheless, the Court need not and does not reach the issue now. The Court only notes that no court yet has addressed this question, and that the question requires balancing complex policy considerations.

9. Defendants argue that unlike a price increase, a lack of innovation is not "passed along" from lessor to renter but is felt only by the renter. Plaintiff responds that the lessor is the only party properly situated to bring suit on behalf of the end users.

As with the question above, the issue requires balancing complex policy issues which the Court need not now address.

make any new purchases of digital editing equipment.[10]

Plaintiff must make such an allegation to demonstrate injury.[11] · The injury described in Plaintiff's current complaint does not result from Plaintiff's position in the purchase market. If Plaintiff were never to have bought another machine, Plaintiff would still have suffered the injury described in the complaint.

In short, Plaintiff's allegations do not suffice to state a claim for antitrust injury in the purchase market.

### D. Plaintiff's Injury as a Lessor of Obsolete Equipment in the Rental Market Does Not Constitute Antitrust Injury

#### 1. Plaintiff's Allegations

■ Reduced to its essence, Plaintiff alleges that Defendants reached a deliberate decision to reduce competition by discontinuing one competing product line in a market that consisted only of two product lines. Plaintiff alleges that it was injured because its business depended upon the existence of the discontinued product line.

#### 2. Application of American Ad II

The Ninth Circuit's recent decision in *American Ad II* provides a helpful guide in determining whether Plaintiff's have stated a claim for antitrust injury.

*a. Unlawful Conduct:* Plaintiff must first identify specific unlawful conduct by the Defendants.

The Defendants do not challenge this element, and Plaintiff has met this requirement. There is no question that Plaintiff has alleged conduct that would violate the antitrust laws.

*b. Causing an Injury to Plaintiff:* Plaintiff must next allege that it has suffered an injury in fact proximately caused by Defendants' alleged conduct.

Again, the Defendant do not challenge this element, and Plaintiff has met this requirement. Plaintiff has alleged an injury that was proximately caused by Defendants' alleged conduct.

*c. That Flows From That Which Makes the Conduct Unlawful:* Plaintiff must also allege that its injury flows from the wrongful nature of Defendant's alleged conduct. As the Ninth Circuit noted in *American Ad II*, this requirement was articulated by the Supreme Court's seminal opinion in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), where the Supreme Court rejected a complaint because the plaintiff's injury would not have come from the illegal nature of the defendant's alleged conduct.

Defendants do challenge this element. Defendants argue that the discontinuation of a product line is not the sort of harm against which the antitrust laws protect consumers. Defendants place heavy reliance on *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th Cir.1998), in which the Ninth Circuit considered the claim of a tire distributor that a rival had wrongfully gained control of a particular brand. The Ninth Circuit rejected the distributor's claim because the distributor's harm resulted from the natural fact of a third party's control of the brand, rather than the fact that the particular rival had gained control of the brand.

---

**10.** In fact, the allegations in the current complaint would suggest that the destruction of demand for Plaintiff's current business has robbed it of any intention to make future purchases.

**11.** Plaintiff must not only allege that it has made or will make a new purchase, but Plaintiff must also allege that the new purchase involved an artificially increased price or an artificially less-innovative machine. Moreover, to the extent that Plaintiff seeks to plead harm from purchasing a less-innovative machine, Plaintiff must allege that the machine is a less innovative digital editing system generally rather than a less innovative Lightworks machine.

Plaintiff responds that the discontinuation of a product line *is* the sort of harm against which the antitrust laws protect consumers. Moreover, the Plaintiff observes that discontinuation may be a natural event in some circumstances, but that it will not be a natural event where competitors conspire to kill one line to benefit another.

The Court agrees with Plaintiff. As the Ninth Circuit observed in *American Ad II*, the antitrust laws are "intended to preserve competition for the benefit of consumers." The most basic form of competition is competition on price within a commodity product. For example, two gold mines may compete to sell a troy ounce of gold more cheaply than the other. But an equally important form of competition is competition between different lines of products that achieve similar goals. Particularly for products in which differences in features are important (and in which improvement is possible), consumers benefit from the competition between manufacturers who are creating different product lines.[12] The importance of competing product lines may be particularly important in high technology fields. *See generally* Susan Creighton & Perry Narncic, "Mergers and Acquisitions: Antitrust Issues in High–Tech and Emerging Markets Growth Markets," 1122 PLI/Corp. 753, 762–64, 776 (1999) (discussing fact that "high technology industries generally are characterized by intense non-price competition" and tendency of competing product lines to "leapfrog" each other in advancing innovation). The Court concludes that the antitrust laws favor competition of product lines, particularly in high technology fields.

Of course, the antitrust laws do not preclude any manufacturer from independently discontinuing a product line any more than they preclude a manufacturer from independently raising prices. When a manufacturer raises prices or discontinues a product in response to market forces, there is no antitrust violation. However, when a manufacturer discontinues a product in return for a benefit from a competitor, this conduct may violate the antitrust laws.

Defendants' reliance on *Lucas* in this regard is misplaced, inasmuch as Defendants would read *Lucas* to say that a harm cannot be an antitrust harm unless it could *only* result from anti-competitive behavior. In fact, *Lucas* stands for a much more limited proposition: a harm is not an antitrust harm if it would *necessarily* have occurred without the anti-competitive behavior. As noted in the preceding paragraph, a harm may still be an antitrust harm if it might occur naturally but in fact occurs because of an anti-competitive agreement.

Returning to the allegations of the present case, the Court has concluded that the discontinuation of a product line has a negative effect on competition. Where competitors reach an agreement that results in such a negative effect in return for a benefit to the discontinuing party, such

---

12. The Court recognizes that there are countervailing benefits in standardization of technical elements. Such standardization will create a larger marker for related products, which in turn will increase economies of scale and allow more competition within the larger market. *See generally,* Mark A Lemley & David McGowan, Legal Implications of Network Economic Effects, 86 Calif. L.Rev. 479, 518 (1998) (discussing benefits of standard-setting organizations). Returning to the automobile context for an example, there is a clear benefit to the fact that most automobiles use certain standard sizes of tires. If tires were not standardized, tire manufacturers would have to make a different size tire for each make and model of car and the market for each tire would be much smaller.

Had Plaintiff alleged that the Defendants agreed to standardize on the Avid system but continue to compete in creative Avid systems, the Court's conclusion on this element might well be different. Put another way, the Court does not mean that competing standards are *always* beneficial to the consumer so long as there are sufficient competitors within a given standard. However, in the absence of competition within a standard, competition between standards is presumptively better than no competition at all.

conduct may be wrongful under the antitrust laws. Because Plaintiff's injury resulted from this discontinuation, Plaintiff's harm resulted from wrongful conduct under the antitrust laws.

*d. That Is Of the Type that the Antitrust Laws Were Intended to Prevent:* Finally, Plaintiff must allege an injury that is of the sort that the antitrust laws were intended to prevent. As the Ninth Circuit noted in *American Ad II*, "injuries which result from increased competition or lower (but non-predatory) prices are not encompassed by the antitrust laws."

The parties hotly contest this issue. Plaintiff argues that its injury is not an injury that resulted from increased competition or lower prices. Defendants argue that Plaintiff's injury is nevertheless not the sort of injury that the antitrust laws were intended to prevent. Defendants contend that Plaintiff's injury resulted from the obsolescence of its current inventory, and that the antitrust laws are not intended to prevent inventory from becoming obsolete.[13]

Clearly Plaintiff is correct that its injury is not an injury that resulted from increased competition or lower prices. If this requirement means only that Plaintiff's harm cannot result from the type of "injury" that is *desired* by the antitrust laws, then Plaintiff must prevail on this element as well.

However, neither the Supreme Court or the Ninth Circuit has formulated the requirement in this way. As formulated, the requirement affirmatively demands that the injury be of the sort that the antitrust laws were intended to prevent. In evaluating this question, the Court finds useful a quotation from two leading antitrust commentators contained within a recent Eleventh Circuit opinion:

> Many mergers have been challenged by suppliers (including dealers, franchisees, and employees providing the merging firms with distribution and other services) displaced as a result of the merger. Injury-in-fact may be doubtful when equivalent opportunities are available elsewhere. If other opportunities do not exist [as alleged by Florida Seed], displaced suppliers made redundant by a merger suffer actual losses but not antitrust injury, for the rationale for condemning a merger lies in its potential for supracompetitive pricing, not in its potential for cost savings and other efficiencies. A merger that actually brings about supracompetitive prices and diminished output reduces the need for inputs and can therefore injure suppliers. Although such an injury connects more closely with the rationale for finding a violation, *it is still not antitrust injury because it is neither the means by which output is restricted nor the direct concern of antitrust rules protecting product market competition.*

*Florida Seed Co., Inc. v. Monsanto Co.,* 105 F.3d 1372, 1375 n. 3 (11th Cir.1997) (quoting Philip Areeda & Herbert Hovenkamp, *Antitrust Law* P 381 (rev. ed.1995)) (emphasis added by this Court). The Court notes that in this last example, the supplier's harm is not a result of lower prices or increased competition.

The antitrust laws are designed to ensure competition, so as to lower prices and to maximize quality and features at a given price. The Court will also assume, for the purposes of this Order, that the antitrust laws are designed to spur innovation. Nothing about the antitrust laws, however,

---

**13.** Defendants also contend that Plaintiff's injury is an injury to an intermediary rather than a consumer, and that the antitrust laws were not designed to protect intermediaries. However, the Court rejects the concept that a harm to an intermediary is never actionable and indeed, *American Ad II* and *Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.,* 951 F.2d 1158 (9th Cir.1991), would both stand for the proposition that harm to an intermediary may be actionable under the right circumstances. It is true that distributors rarely have antitrust standing, but this relates more to the fact that the antitrust laws do not exist to prefer one distributor over another.

is designed to insure that a plaintiff's inventory remains current.

Plaintiff's injury is integrally related to the "lock-in" phenomena noted above in Footnote 6. Both the courts and commentators have observed that consumers may be locked into particular product lines and therefore be less willing to shift to another product line. Such a "lock-in" phenomena is regularly discussed as a potential barrier to entry and there has been much discussion about the extent to which "lock-ins" can define the relevant marketplace for the purpose of determining market power. *See, e.g., General Business Systems v. North American Philips Corp.*, 699 F.2d 965 (9th Cir.1983) (rejecting market limitation to particular product line despite possible lock-in of some consumers).

Plaintiff's claim raises a different "lock-in" concern. Plaintiff's basic position is that, because it is locked into a particular product line, it suffers harm when the product line is discontinued. Owners who are locked into a product line always suffer harm when the product line is discontinued, because there are many fewer developments for the product line either from the manufacturer or from third-party vendors, Returning to the automobile example, if General Motors were to cease producing Oldsmobile cars, every owner of an Oldsmobile would suffer some harm because there would be fewer after-market options and fewer Oldsmobile specialists. Indeed, every owner of an Oldsmobile might discover that, as a result of these factors, the resale value of their used car had dropped right after General Motors made the discontinuation announcement.[14]

In addition, if Plaintiff were to have remained in the rental market, Plaintiff would have had to shift from Lightworks to Avid and thereby incur the costs of such a product transition. In other words, the "lock-in" effect exists because shifting from one product line to another is costly, and the discontinuation of Lightworks would eventually require Plaintiff (and all other Lightworks users) to incur this expense.

In the Court's research, the Court has found no suggestion that the antitrust laws seek to protect consumers against the lack of support or the expense involved in a product-transition. If Plaintiff were correct, all Lightworks owners (and all owners of any artificially discontinued system) would suffer an *antitrust* injury in the lessening of both manufacturer and third-party support. The Oldsmobile owners in the previous example would suffer an antitrust injury in the reduction in the used value of their care. The Court notes that although such injury results from anticompetitive activity, it has no relation to any anti-competitive benefit, such as monopoly profits, received by the monopolist.

In other words, the Court agrees that such owners suffer an injury, but the Court concludes that this is not the sort of injury against which the antitrust laws were intended to protect. *See generally Associated General*, 459 U.S. at 524, 103 S.Ct. 897 ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."); *Exhibitors' Service, Inc. v. American Multi-Cinema, Inc.*, 788 F.2d 574, 580 n. 7 (9th Cir.1986) ("The fact that injury has occurred and that other claims have failed does not permit this court to expand the coverage of [antitrust law].").

Put yet another way, the Court concludes that the antitrust laws do not protect consumers against the diminution in value of their current inventory, even when they are locked-into that inventory and will incur expenses in transition. Expressed in terms used by the Plaintiff, the Court concludes that the "stigma of obsolescence" is not the sort of harm against

---

**14.** The Court expects that owners of Peugeot automobiles suffered such an immediate drop in the value of their Peugeot automobiles when Peugeotd cease selling cars in this country.

which the antitrust laws were designed to prevent.[15]

The parallel between Areeda and Hovenkamp's last example and the current case is clear. In both cases, the potential plaintiff suffers an actual injury, proximately caused by the defendants' behavior, and traceable to the anti-competitive nature of that behavior. However, the harm to the plaintiff does not relate to the goals of the antitrust law in protecting competition in the market.

As such, the Plaintiff fails to state a claim for antitrust injury and consequently fails to state a claim for an antitrust violation.

■ e. *Participant In the Relevant Market:* In addition to the four ARCO elements discussed above, the Ninth Circuit in *American Ad II* identified a fifth requirement, the requirement that the plaintiff be a participant in the market in which trade was restrained by the defendants.

Plaintiff has effectively argued that it meets this requirement solely by virtue of the fact that it has been a customer in the purchase market for non-linear digital editing equipment. As a threshold matter, the Court would again note that although Plaintiff had previously been a customer in that market, there is no allegation that Plaintiff would continue to be a purchaser in that market. The fact that one was a past participant in the market is not relevant for this determination.

More importantly, the Court concludes that this requirement is really a requirement that plaintiff must suffer its harm as part of the market in which trade is being restrained. In reaching this conclusion, the Court notes that the requirement is a necessary part of antitrust *injury* rather than antitrust standing; this high-lights the fact that the market participation requirement is related to the injury and not merely to the actor's abstract status. As the Ninth Circuit explained in *American Ad II*, there is no magic about one's abstract status that meets this requirement: "it is not status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *American Ad II*. In other words, the mere fact that one has the status of "customer" in the restrained market will not make the injury antitrust injury if the injury is suffered in another market.[16]

Plaintiff's allegations are that Defendants restrained trade in the market for new digital nonlinear editing systems. However, Plaintiff did not suffer its injury as a customer in the market to buy new non-linear digital editing systems. Rath-

**15.** Plaintiff's argument that the antitrust laws *do* protect against stigmatization is misplaced. It is true that the antitrust laws will prevent stigmatization where such stigmatization is a tool to limit competition. *See, e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) The antitrust harm in those cases, however, is not the stigmatization per se but the use of stigmatization to limit competition and target competitors. *See generally National Ass'n of Review Appraisers and Mortg. Underwriters, Inc. v. Appraisal Foundation,* 64 F.3d 1130 (8th Cir.1995) (holding that stigmatization not actionable where it does not restrain trade); *Schachar v. American Academy of Ophthalmology, Inc.,* 870 F.2d 397 (7th Cir.1989) (same).

In this case, Plaintiff's injury does not result from stigmatization intended to reduce competition, but merely as a byproduct of Defendants' activity in a different market.

**16.** Reference to the last Areeda and Hovenkamp example may help clarify this point. Assume that a steel company supplies raw steel to a forklift manufacturer. Assume further that the forklift manufacturer merges with its only rival, and the resulting firm raises prices and cuts output. The steel company sells less steel to the combined forklift company.

The steel company's injury as a supplier is not antitrust injury merely because the company also happens to be a forklift customer who buys forklifts. The steel company may, of course, bring suit for higher forklift prices—which is the market in which the steel company is the customer.

er, Plaintiff suffered its injury as a *lessor* in the market for renting out non-linear digital editing systems. Plaintiff's injury was not suffered in the market where Plaintiff has alleged that Defendants restrained trade.[17]

Plaintiff argues that it is a party who is "inextricably intertwined" with the injuries of market participants. *See American Ad II* at n. 5 (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) and *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 745–46 (9th Cir.1984)). However, Plaintiff has failed to focus on the proper market. It is true that Plaintiff is "inextricably intertwined" with those who rent its machines and to the extent that those customers were complaining of higher prices or less-innovative machines, Plaintiff's entanglement with those customers might give it antitrust standing. However, Plaintiff's customers are not market participants in the purchase market for new digital editing machines and Plaintiff's harm is not related to its customers' harm. Unlike the patient in *McCready* whose harm was related to the limitation on psychiatric services (and who was a customer in the relevant market), Plaintiff's injury is not "inextricably intertwined" with the harm suffered by end users.[18]

Plaintiff has relied on *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999) to argue that a plaintiff need not be a participant in the market in which competition was restrained, if plaintiff is a participant in a related market. However, Plaintiff's reliance is misplaced for two reasons. *Big Bear* involved an agreement between ski lift operators, preferred lodging operators and preferred lodging referral services to cut off the supply of discounted lift tickets to disfavored lodging operators and disfavored lodging referral services. First, the plaintiffs in *Big Bear* suffered their harm in the lift ticket market as consumers of lift tickets, because they had to buy full-price lift tickets to create lodging packages. In addition, however, *Big Bear* involved a conspiracy between the resort operators and preferred lodging operators. To the extent that the plaintiff lodging operators suffered their harm in the lodging market, they were competitors with the members of the conspiracy who the conspiracy attempted to benefit. By contrast, Plaintiff in this case did not suffer its harm in the purchase market, and it is not a competitor with any member of the conspiracy.

## IV. CONCLUSION

The Court concludes that the allegations of the current complaint, as pled, do not demonstrate antitrust injury. Where a plaintiff fails to establish antitrust injury, the Court need not consider the remaining factors for antitrust standing because the plaintiff cannot establish antitrust standing. *Florida Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1375 (11th Cir.1997).

The Court DISMISSES WITHOUT PREJUDICE the antitrust claims.

17. It is not sufficient that the plaintiff's harm be closely tied to the market in which trade was restrained, if plaintiff is not a participant in that market. *See Eagle v. Star–Kist Foods, Inc.*, 812 F.2d 538, 540–41 (9th Cir.1987) (rejecting claims of crew members who received commission on fish catch because crew members were not participants in the sale of the fish, which was the market in which canneries were allegedly restricting trade.)

18. Although *Ostrofe* is more helpful to Plaintiff, it still does not expand the "narrow exception" sufficiently to bring Plaintiff within the exception. Ostrofe was an employee who was terminated for refusing to participate in a bid rigging-scheme. *Ostrofe* does say that the employee could sue because "the injury he sustained was such an integral part of the scheme to eliminate competition." 740 F.2d at 746. However, the Ninth Circuit made it clear that by "integral part," the Ninth Circuit meant that the plaintiff's injury was necessary to achieve the conspirators' illegal end. *Id.* at 746 ("The discharge of Ostrofe furthered the anti-competitive scheme.")

There is no allegation in this case that the harm to Digital Images was necessary to achieve the Defendants' goal.

Should Plaintiff desire to amend, Plaintiff should file an amended complaint by Tuesday, November 2, 1999.

IT IS SO ORDERED.